## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION,** | § | |
| | § | |
| Plaintiff, | § | |
| **v.** | § | **CASE NO.  3:14-CV-01747-D** |
| | § | |
| **CHARLES COUCH** | § | |
| **and COUCH OIL & GAS, INC.,** | § | |
| | § | |
| Defendants. | § | |

## <u>BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Dated:  August 24, 2015.

Respectfully submitted,

 */s/ Janie L. Frank*
Janie L. Frank
Texas Bar No. 07363050
Timothy Evans
Texas Bar No. 24065211
SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6478
(817) 978-4927 (facsimile)
*frankj@sec.gov*

COUNSEL FOR PLAINTIFF

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iv

I.      INTRODUCTION ....................................................................................................1

II.     SUMMARY JUDGMENT STANDARD........................................................................2

III.    STATEMENT OF UNDISUPUTED FACTS ..............................................................3

       A.      After a lengthy career in the oil and gas business, Couch began the
offerings at issue here in approximately 2010 ......................................................3

              1.      Overview of the 59 Well Program ............................................................4

              2.      Overview of the R9 Well Program ............................................................5

              3.      Investors were offered fractional interests in the working interest
of the wells ................................................................................................ 7

       B.      Couch's Offering Documents were limited and investors were not provided
meaningful information about the projects after investing ...................................7

       C.      Defendants paid commissions to a sales force to sell the working interests ........8

       D.      Couch terminated the R9 Well Program fundraising early.................................10

       E.      Defendants misrepresented both programs to investors ....................................12

IV.    ARGUMENTS AND AUTHORITIES..........................................................................14

       A.      As a threshold matter, the investments in this case were securities,
and therefore Defendants' first affirmative defense is without basis
in fact or law ......................................................................................................14

              1.      Defendants sold fractional units of the oil and gas working
interest in the wells ................................................................................15

              2.      Defendants did not provide investors with joint venture documents......16

              3.      Regardless of what investors received, the investment is not a
joint venture under the *Williamson* factors ............................................18

B.    The Court should grant summary judgment on the Commission's third claim that Defendants offered and sold securities in unregistered offerings, without an exemption. .....................................................................22

    1.    The Commission has established a *prima facie* Section 5 violation ...............................................................................................22

    2.    Defendants cannot meet their burden to establish an exemption from registration...........................................................................23

        a.    *Defendants cannot claim the private placement exemption* .......24

        b.    *Defendants cannot prove they qualified for any of the Regulation D exemptions* ...........................................................27

C.    The Court should grant summary judgment on the Commission's first and second causes of action because Defendants violated the federal securities laws' antifraud provisions by misrepresenting and omitting material facts................................................................................29

    1.    First misrepresentation/omission: Defendants misrepresented the nature of the interests that investors were purchasing .....................32

    2.    Second misrepresentation/omission: Defendants misrepresented the use of funds .......................................................................33

    3.    Third misrepresentation/omission: Defendants materially overstated the oil production that they would or could produce and the ultimate rate of investor return ...................................36

    4.    Fourth misrepresentation/omission, on the R9 Well Program: Defendants misrepresented their experience, expertise, and success with radial jet drilling.............................................................44

    5.    Fifth misrepresentation/omission, on the R9 Well Program: Couch decided to terminate the R9 Well Program fund-raising early, but did not tell investors or modify the Offering Documents, and then misrepresented how he would raise the remainder of the money ................................................................................46

    6.    Couch's *scienter* is imputed to COG ......................................47

       7.     Alternatively, Defendants were negligent................................................48

   D.    Defendants' other affirmative defenses have no merit .......................................48

      1.    The statute of limitations has not expired ................................................49

      2.    Defendants' ratification and estoppel defenses are without merit as a matter of law   ........................................................................................49

V.    CONCLUSION..........................................................................................................50

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aaron v. SEC*,
  446 U.S. 680 (1980)..........................................................................................30, 31, 48

*Adena Exploration, Inc. v. Sylvan*,
  860 F.2d 1242 (5th Cir. 1988) ..................................................................................15, 23

*Anderson v. Libby Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................2, 3

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)..................................................................................................31

*Bayoud v. Ballard*,
  404 F. Supp. 417 (N.D. Tex. 1975) ..............................................................................15

*Broad v. Rockwell Int'l Corp.*,
  642 F.2d 929 (5th Cir. 1981) ......................................................................................31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................................2

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)..................................................................................................31

*Forsyth v. Barr*,
  19 F.3d 1527 (5th Cir. 1994) ......................................................................................2

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ....................................................................................31

*Hassinger v. JP Morgan Chase & Co.*,
  394 Fed. Appx. 63 (5th Cir. 2009)................................................................................2

*Heckler v. Community Health Servs. Of Crawford County, Inc.*,
  467 U.S. 51 (1984)....................................................................................................50

*I. Myer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
  936 F. 2d 759 (2d Cir. 1991)......................................................................................32

*Meadows v. SEC*,
　　119 F.3d 1219 (5th Cir. 1997) ....................................................31, 48

*Moses v. Michael*,
　　292 F.2d 614 (5th Cir. 1961) ...........................................................15

*Nolfi v. Ohio Kentucky Oil Corp.*,
　　675 F.3d 538 (6th Cir. 2012) ...........................................................15

*Nor-Tex Agencies, Inc. v. Jones*,
　　482 F.2d 1093 (5th Cir. 1973) .........................................................15

*Reves v. Ernst & Young*,
　　494 U.S. 56 (1990)...........................................................................21

*SEC v. Alternate Energy Holdings Inc.*,
　　2014 WL 2515710 (D. Id. 2014) .....................................................26

*SEC v. Aronson*
　　2013 WL 4082900 (S.D.N.Y. Aug. 6, 2013)....................................35

*SEC v. Brooks*,
　　1999 WL 493052 (N.D. Tex. July 12, 1999) ....................................31

*SEC v. C.M. Joiner Leasing Co.*,
　　320 U.S. 344 (1943)....................................................................15, 21

*SEC v. Cont'l Tobacco Co. of S.C.*,
　　463 F.2d 137 (5th Cir. 1972) .......................................22, 23, 24, 25

*SEC v. Culpepper*,
　　270 F.2d 241 (2d Cir. 1959)............................................................50

*SEC v. Dain Rauscher*,
　　254 F.3d 852 (9th Cir. 2001) ...........................................................30

*SEC v. Fehn*,
　　97 F.3d 1276 (9th Cir. 1996) ...........................................................31

*S.E.C. v. Gann*,
　　565 F.3d 932 (5th Cir. 2009) ......................................................30, 31

*SEC v. Gulf & Western Indus., Inc.*,
　　502 F. Supp. 343 (D.D.C. 1980) ................................................49, 50

*SEC v. Holschuh,*
  694 F.2d 130 (7th Cir. 1982) ...............................................................................4, 22, 32

*SEC v. Hopper,*
  2006 WL 778640 (S.D. Tex. Mar. 24 2006).............................................................48

*SEC v. Keating,*
  1992 WL 207918 (C.D. Cal. July 23, 1992)........................................................49, 50

*SEC v. Kenton Capital, Ltd.,*
  69 F. Supp. 2d 1 (D.D.C. 1998) ...............................................................................26

*SEC v. Manor Nursing Ctrs, Inc.,*
  458 F.2d 1082 (2d Cir. 1972)...................................................................................47

*SEC v. Morgan, Lewis & Bockius,*
  209 F.2d 44 (3d Cir. 1953).......................................................................................50

*SEC v. Murphy,*
  626 F.2d 633 (9th Cir. 1980) .......................................................................24, 25, 26

*SEC v. Phan,*
  500 F.3d 895 (9th Cir. 2007) ...................................................................................31

*SEC v. Platforms Wireless Int'l Corp.,*
   617 F.3d 1072 (9th Cir. 2010) ...........................................................................25, 31

*SEC v. Provident Royalties, LLC,*
   2013 WL 5314354 (N.D. Tex. Sept. 23, 2013).......................................................30

*SEC v. Haligiannis,*
  470 F. Supp. 2d 373 (S.D.N.Y. 2007)......................................................................36

*SEC v. Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ...................................................................................31

*SEC v. Quinlan,*
  373 Fed. Appx 581 (2010) .........................................................................................2

*SEC v. Rabinovich & Assoc.,*
  2008 U.S. Dist. LEXIS 93595 (S.D.N.Y. 2008).......................................................28

*SEC v. Ralston Purina Co.,*

346 U.S. 119 (1953)..................................................................................24, 27

*SEC v. Research Automation Corp.*,
    585 F. 2d 31 (2d Cir. 1978)..............................................................................35

*SEC v. Rose*,
    2007 WL 7117887 (S.D. Tex., Mar. 23, 2007).................................................25

*SEC v. Schooler*,
    2014 WL 1660651 (S.D. Cal. Apr. 25, 2014)....................................................19

*SEC v. Seghers*,
    298 Fed. Appx. 319 (5th Cir. 1980).................................................................30

*SEC v. Shields*,
    744 F.3d 633 (10th Cir. 2014)..........................................................................23

*SEC v. Spence & Green Chemical Co.*,
    612 F.2d 896 (5th Cir. 1980) ............................................................................25

*SEC v. Southwest Coal and Energy Co.*,
    624 F.2d 1312 (5th Cir. 1980) ..........................................................................31

*SEC v. Tecumseh Holdings Corp.*,
    765 F. Supp. 2d 340 (S.D.N.Y. 2011).............................................................36

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)..........................................................................................18

*In re Samuel E. Wyly*,
    526 B.R. 194 (N.D. Bankr. Jan. 9, 2015)...........................................................2

*Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*,
    395 F.3d 533 (5th Cir. 2004) ..............................................................................3

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)................................................................................47

*Swenson v. Engle*,
    626 F.2d 421 (5th Cir. 1980) ............................................................................22

*Tidewater, Inc. v. United States*,
    565 F.3d 299 (5th Cir. 2009) ..............................................................................2

*United Housing Found., Inc. v. Forman*,
    421 U.S. 837 (1975) ...........................................................................................19

*Western Fed. Corp. v. Erickson*,
    739 F.2d 1439 (9th Cir. 1984) .........................................................................25

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) .............................................................18, 21, 23

## FEDERAL STATUTES

15 U.S.C. § 77b(a)(1) ................................................................................................18

15 U.S.C. § 78j(b) ....................................................................................................29

15 U.S.C. § 78c(a)(10) .............................................................................................18

15 U.S.C. §§ 77e(a), 77e(c) .....................................................................................22

15 U.S.C. § 77c(a)(2),þ(a)(8þ ..................................................................................24

15 U.S.C. § 77d(a)(2) ...............................................................................................24

15 U.S.C. § 78z ........................................................................................................49

17 C.F.R. § 240.10b-5 ..............................................................................................29

28 U.S.C. 2462 .........................................................................................................49

Fed. R. Civ. P. 56 .......................................................................................................2

Pursuant to Fed. R. Civ. P. 56, Plaintiff Securities and Exchange Commission ("Plaintiff" or "the Commission") files its Brief in Support of Motion for Summary Judgment, and respectfully shows as follows[1]:

## I.
## <u>INTRODUCTION</u>

Charles Couch ("Couch") and his company, Couch Oil & Gas, Inc. ("COG") (collectively, "Defendants"), raised approximately $9.8 million in two unregistered securities offerings, from mid-2010 through January 31, 2012.  Through these offerings, Defendants offered potential investors working interests in oil wells in two West Texas drilling programs.  As a threshold matter, these securities[2] offerings were not registered with the Commission in violation of Section 5 of the Securities Act of 1933.  Moreover, from the outset, Defendants misled investors about what they would actually receive as their investment, the likelihood of drilling success and resulting high returns, and the way in which investors' money would be spent.  Finally, with regard to one of the programs, after having decided to terminate the fund-raising efforts described in his offering materials, Couch continued to accept investor funds without disclosing that materially changed circumstance.  Because there is no genuine dispute of material facts regarding these actions, Plaintiff moves for summary judgment on its third cause

---

[1]	All evidentiary citations are to Plaintiff's Appendix in Support of its Motion for Summary Judgment ("Appendix") filed concurrently with the Commission's motion and this brief, and fully incorporated herein.  The pages in the Appendix are marked "SEC_APP-xxxxx".  For simplicity, they will be cited to herein as "App. xxx."

[2]	As discussed below, the Defendants have asserted in an affirmative defense that they were actually selling interests in a joint venture and that these interests fall outside the broad definition of a security.  While a common defense in SEC enforcement actions arising from fraudulent activities in the oil and gas industry, that argument has no place here.  While Couch may have made some isolated use of a Confidential Private Placement Memorandum (referred to herein as the "PPM") that referenced potential interests in a joint venture, it is undisputed that the Defendants never even created, much less used, a joint venture agreement.  Moreover, as Couch himself admits, this was a "passive investment" and the investors had no management role or rights whatsoever.  For these and other reasons noted below, it is beyond dispute that the Defendants offered and sold securities.

of action (violations of Section 5) and on its first and second causes of action (securities fraud).

In addition, because none have any support in the record, the Commission asks for summary

judgment as to each of the Defendants' affirmative defenses.[3]

## II.
## SUMMARY JUDGMENT STANDARD

Summary judgment upon all or any part of a claim is appropriate where there is no genuine

dispute as to any material fact regarding that portion of the claim. Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Commission, as the movant, bears the

initial burden of identifying the evidence that demonstrates the absence of any material fact. *See*

*Celotex*, 477 U.S. at 323. Once that burden is met, Defendants cannot rest on mere denials,

conclusory statements, or evidence that is merely colorable or not significantly probative to

defeat the motion. *Celotex Corp.,* 477 U.S. at 324*; Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.

1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment

evidence."). Instead, they must submit significant probative *evidence* to show that material, triable

issues of fact remain. *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) . "The mere

scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*,

477 U.S. at 252.

"On cross motions for summary judgment, the court reviews each motion independently,

viewing the evidence and inferences in the light most favorable to the non-moving party."

*Hassinger v. JP Morgan Chase & Co*., 394 Fed. Appx. 63, 65 (5th Cir. 2010); *see also Tidewater*

*Inc. v. United States*, 565 F.3d 299, 302 (5th Cir. 2009). "If there is no genuine issue and one of

---

[3]     If the Court grants the Commission's motion, the only remaining issue to be decided will be what remedies to impose. All relief the Commission seeks is equitable; thus, the decision on relief is reserved for the Court, not the jury. *See generally SEC v. Quinlan*, 373 Fed. Appx. 581, 587 (2010) (equitable relief in SEC enforcement actions may include orders of disgorgement, injunctions against future violations, or imposition of officer and director bars); *In re Samuel E. Wyly*, 526 B.R. 194, 200 (N.D. Bankr. Jan. 9, 2015).

Re:  SEC v. Couch, et al.                                                                                                   2
SEC's Motion for Summary Judgment

the parties is entitled to prevail as a matter of law, [this] court may render summary judgment."

*Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 539 (5th Cir. 2004).

In short, the Court must enter summary judgment if, under the governing law, there is only one reasonable conclusion. *Anderson,* 477 U.S. at 250.

## III.
## STATEMENT OF UNDISPUTED FACTS

**A.     After a lengthy career in the oil and gas business, Couch began the offerings at issue here in approximately 2010.**

Couch has been in the oil and gas business for more than 45 years. (APP 0061). He incorporated COG in 2004.  (App. 603 [Couch Depo. 58]).  He is COG's sole owner, president, and CEO.  (App. 604 [Couch Depo. 61-63]).

In approximately 2008, Couch began packaging multiple proposed oil wells into drilling programs and seeking individual investors for the programs. (App. 600-601, 602 [Couch Depo. 47-49; 55-56]).  Two of these offerings are issue in this case.  In mid-2010, he began offering fractional working interests as part of the Permian-Black Shale-Fifty Nine Well Program ("59 Well Program").  In the summer of 2011, he began offering fractional working interests in the Radial Nine Well Program ("R9 Well Program").[4]  Defendants offered these investments through general solicitations and did not register the offerings with the Commission. (Defendants' Answer, at ¶ 7 [Dkt. 21]; App. 003, 079 [at ¶ 4(d)]; 602 [Couch Depo. 49-51]; 53-54).

---

[4]     Three prior programs, which are sometimes referred to herein, were generally known as the Palo Pinto, the Palo Strawn, and the Palo Bakken. (*See* App. 607 [Couch Depo. 112]).

Re:  SEC v. Couch, et al.                                                                                              3
SEC's Motion for Summary Judgment

### 1.      Overview of the 59 Well Program.

In approximately July 2010, Defendants began offering the 59 Well Program. (App. 470).

Defendants' brochure for this program, called "Executive Summary," stated that they planned to

drill seven new wells—five vertical and two horizontal—and to rework 52 wells in the existing

Andrews Field in West Texas, at a turnkey cost of $9,990,000. (App. 151, 160).   Defendants

offered for sale 50% of the working interest, in 1% units for $99,900 each, with the goal of

raising $4,995,000 from outside investors.  Defendants would retain or earn the remaining 50%

of the working interest in exchange for their contribution of $4,995,000 in cash, labor, and

equipment. (App. 160).

Defendants stated that the new wells would be drilled in "proven undeveloped productive

oil zones" within existing oil fields in West Texas.  (App. 151). They stated:

> The planned total production is expected to be 270 Barrels of Oil Per Day (bopd)
> to 1,580 bopd from all fifty nine wells.  Estimated 30% APR payback if all wells
> obtain estimated **minimum** daily production.

() (emphasis in original).  Defendants' well-by-well chart showed that the five vertical wells

were each expected to produce 20 to 80 bopd; one horizontal well was projected at 50 to 400

bopd; the other horizontal well was projected at 100 to 700 bopd; and the 52 reworked Andrews

Field wells were expected to collectively produce 20 to 80 bopd. (*Id.*). Omitted from the

brochure was any reference to the fact that Defendants only own 75% of the working interest in

the Andrews Field.  (App.  605-606 [Couch Depo. 102; 104-105]). This was an intentional

material omission.  *See, e.g., SEC v. Holschuh,* 694 F.2d 130, 142 (7th Cir. 1982) (finding that

"information concerning the true ownership of [investment properties] would have been

important to the offerees in making their investment decisions).

Defendants stopped offering the 59 Well Program in mid-2011, after they began offering

the R9 Well Program.  (App. 470).  By that time, Defendants oversold the 59 Well Program by

approximately $2 million: instead of raising $4,995,000, Defendants raised approximately

$7,100,000, from 139 investors.  (*Id*.).

The drilling program was unsuccessful. Defendants ultimately did not drill the two

horizontal wells.  (App. 322).  Defendants did drill the five vertical wells in the program, but

three of those wells produced oil at a rate below Defendants' estimated minimum of 20 bopd in

the brochure.  (App. 323).  Couch knew that this estimate of 20 bopd for these three wells was

incorrect by January 2011 (*see infra* at Section IV.C.3., at p. 36), but Defendants continued to

represent that the estimated production from all five vertical wells would be a minimum of 20

bopd, and up to 80 bopd.

In spite of Defendants' reassuring statements in the brochure (such as, "We will find

fairly significant oil reserves", App. 152), the returns on the 59 Well Program were marginal.

The wells in the 59 Well Program generated $453,809.52 in oil revenues, which, after operating

expenses, yielded only $267,849.02 in distributions to the 139 investors.  (App. 471, 477 ["Ex.

42"]).  On the $7.1 million raised (in contrast to the $4,995,000 Defendants represented they

were raising), that is a 3.8% return of the original investment.

## 2.    Overview of the R9 Well Program.

Defendants began offering the R9 Well Program, in the summer of 2011. (App.  637-638,

[Tuthill 88-90]; 663 ["Ex.7"]).  In their offering materials, Defendants stated they would drill

nine new horizontal wells, also to be located in "proven undeveloped productive oil zones" in

existing oil fields in West Texas.  (App. 062).  The turnkey cost to drill the wells was

$10,000,000, but Defendants stated they planned to raise $7,500,000 from investors.  Defendants

offered participation in 75% of the working interest in the wells, in 1% increments, for $100,000 each.  (App. 073).  Defendants would contribute $2.5 million in "sweat equity" and receive the remaining 25% of the working interest. (App. 589 [Couch III-222]).

As part of their marketing efforts, Defendants told investors that, in this program, the Defendants would be using radial jet drilling technology. (App. 066-069).  They implied that they had successfully used such technology in the past to obtain more cost effective oil production.  For example, Defendants stated:

- "Radial Jet Drilling Enhancement technology is a much more cost efficient process over conventional techniques.  The process enables jetting lateral holes further into the strata opening up the formation to allow for freer flow of hydrocarbons into the well bore, thus increasing the production rate of a well." (App. 067).

- "Radial Jet Drilling allows us to drain oil from 3 to 4 productive oil zones at a time."  (App. 067).

- "Most of our laterals extend 300' to 500' from the original vertical oil well bore once we validate a good oil productive structure." (App. 066).

Defendants estimated that the nine new wells would produce between 50 to 400 bopd, or collectively 705 bopd, but arbitrarily discounted that to 282 bopd.  Ultimately, Defendants only drilled two of the nine wells in this program, which collectively produced at 3 bopd per day. (App. 326-327). As for the returns, the R9 Well Program generated $58,306.04 in oil revenues in 2013, with only $39,093.39 distributed to investors after operating expenses. (App. 471, 477). Based on the $2,800,000 raised (not the $7,500,000 Defendants planned to raise), that is a return of 1.3% of the original investment.[5]

---

[5]     "Ex. 42," Defendants' chart showing oil revenues and distributions from 2009-2013, also shows that Defendants' three prior multi-well programs—the Palo Pinto, Palo Strawn, and Palo Bakken—were equally unsuccessful.  (App. 477).  Even High Island, a single-well investment, was a disaster.  This data contradicts the

### 3. Investors were offered fractional interests in the working interest of the wells.

Defendants offered investors fractions of the working interests in the oil wells in each drilling program.  (App. 160; 073; 001; 076-77).  But Defendants never conveyed the fractional working interests to the investors, and in fact COG retains title to the working interest. (App. 580 [Couch III-124]).  Couch claimed that Defendants sent investors documentation that they owned the working interest in each property.  (App. 546 [Couch I -66]).  But he later admitted that the "documentation" purporting to represent ownership that was sent was only the subscription agreements. (App. 580, 590-591 [Couch III-123; 232-233]).  The subscription agreements, however, are not documents of title.  They do not reflect an ownership interest in any particular well; nor do they identify the name of any well. They do not include the county or legal property description of any well's location.  (App. 001-007; 075-084).  They are not assignments.  The investors never received any documents that reflected an assignment to them of their ownership of the working interest in each well. (App. 190, 193, 223).

### B. Couch's Offering Documents were limited, and investors were not provided meaningful information about the projects after investing.

For each of the offerings, investors generally received a brochure describing the program and a subscription agreement ("Offering Documents").  (App. 145, 192, 207, 221-222; 605 [Porter 77-78]; 632-633 [Tuthill 44, 46-47]).  Defendants prepared and drafted these documents. (Defendants' Answer, at ¶ 19).[6]  These documents were sent to prospective investors by

---

representation in Defendants' R9 Well Program brochure about COG being "well positioned for continued growth and profitability for the balance of the decade."  (App.  070).

[6]      Couch also testified that he put together the R9 Well Program "Business Synopsis" (App. 059-074).  (App. 544 [Couch I-36]); *see also* 585 [Couch III-172]). Kirk Porter, one of the sales agents, testified that he and the others helped prepare Defendants' brochures in both programs, but that Couch approved them before the brochures were

Defendants and their sales agents.   (App. 655 [Porter 79-80]; 632, 633 [Tuthill 44, 46]; 145, 151-162; 192, 195-205; 221, 226, 239-249, 260, 272-287; 476, 478).   Couch also personally handed out the brochures. (App. 207, 209-219).

Defendants generally did not provide the investors with any other offering materials. In particular, Defendants drafted a private placement memorandum ("PPM") for each program (App. 008-058; 085-143).   But to date, the Commission has been unable to find evidence of an investor receiving one.   (App. 148, 190, 193, 207, 223-224; 475-476; 482-483).   Defendants also did not provide prospective investors with any financial information on COG or the drilling program. (App. 190, 193).   In fact, when investors requested financial information, they were told they could not have it or received only outdated and irrelevant information. (App. 190, 193; see 147).   In addition, Couch has never had the financials on COG or the drilling programs audited, and so did not, and could not, provide audited financial statements to the investors. (App. 622 [Couch Depo. 202]).

**C.      Defendants paid commissions to a sales force to sell the working interests.**

In early 2009, Couch hired several individuals in California purportedly for website maintenance, but quickly began using them to handle investor calls and sell investments. (App. 599-600 [Couch Depo. 44-45]; 565 [Couch II-266]; 576 [Couch III-104]; 630-631 [Tuthill 31-37]; 646, 648, 650, 655-656, 657 [Porter 16, 24, 30, 80-82; 90-91]).   These individuals—Kirk Porter, Greg Tuthill, Robin Charlet, and Steven Sparks (hereinafter the "Brokers")—became Defendants' sales agents or brokers, selling the working interests on Defendants' behalf.  (App. 631-632, 633 [Tuthill 39-42, 44, 46]; 647-648 [Porter 19-21, 23]; 599-600 [Couch Depo. 44-

---

used.  (App. 655 [Porter 77-78]).  Couch also testified that he drafted the subscription agreements. (App. 596 [Couch Depo 25-26]).

45]).  They were not associated with a registered broker-dealer or licensed by FINRA.  (App. 483; 626-627 [Tuthill I-12, 95]; 643 [Porter I-13]).  The Brokers had no background in the oil and gas business before working for Couch.  (App. 632, 635 [Tuthill 43-44]; 654 [Porter 66]).  Anything they told the investors was information they obtained from Couch.  (App. 634 [Tuthill 61]; *see also* 661 [Porter 154, 155]).  They were in daily contact with Couch.  (App. 651, 656 [Porter 34, 83]; 635 [Tuthill 65]; 594 [Couch Depo. 18-19]).

Couch paid the Brokers 30% of the proceeds received from any investor they successfully persuaded to invest.[7]  (App. 470, 474; Ex. 59; 564 [Couch II-264]; 577, 578 [Couch III-106-108, 112]; 650, 657-659 [Porter 30; 91-93, 96-97]).  Couch wired those funds to a company called XO Marketing, LLC, which Porter owned.  (App. 577 [Couch III-107]; 650 [Porter 30]).  Porter distributed the sales commissions to the individual broker who signed up the investor.  (App. 650, 657, 658-659 [Porter 30, 91-92; 96-98]; 635, 637 [Tuthill 67, 87-88]; 578 [Couch III-110]).  The Brokers were not formal employees of COG, in that COG did not send them a W-2 tax form, but they considered themselves to be COG employees, represented themselves as such to the investors, and considered Couch to be their boss.  (App. 650, 635 [Porter 30, 67]; *see, e.g.,* 226 (email with logo)).  Couch never informed investors that he would be using unregistered brokers to sell interests in the two programs, or that he would be paying these unregistered brokers 30% of the money he raised for the programs.  (App. 149, 191, 194, 224; 582 [Couch III-149-150]).

---

[7]       The 30% fee was allegedly half for bringing in new investors and half for website work.  (App. 565 [Couch II-266]; 577 [Couch III-106]).  That self-serving claim is unlikely, given that the Brokers were only paid if they brought in an investor.  For example, Couch did not compensate the Brokers if he brought in an investor.  (App. 564 [Couch II-263]).

**D.      Couch terminated the R9 Well Program fundraising early.**

Not long after the R9 Well Program started, on October 28, 2011, the Commission staff met with Couch to discuss his fund-raising activities. (App. 548 [Couch I-69]).  By that date, Defendants had sold approximately $483,000 in working interests in the R9 Well Program. (App. 474).  Couch claimed in sworn testimony that, after the meeting, he decided to "shut down the money-raising" on the R9 Well Program. (App. 572 [Couch III-74-76]).  Couch testified that he told the Brokers within days of meeting with the Commission to "wind up" the R9 Well Program. (App. 554-556, 556a [Couch I-94-96; 98]; 573 [Couch III-77, 79]).

It is unlikely that Couch told the Brokers to "wind up" the program within days of the Commission meeting, given that between October 29, 2011, and January 31, 2012, Defendants sold another $2.35 million in working interests, or 84% of the total funds raised in the program, (App. 470).  According to the Brokers, he did not tell them to stop selling until January 2012. (App. 603 [Porter 103-104]; 639 [Tuthill 97-99]).  Moreover, available documentary evidence shows Tuthill announcing by email the end of the fundraising from individual investors on January 23, 2012, telling them that in three days Defendants would no longer accept funds in the R9 Well Program from individual investors. (App. 260; 639 [Tuthill 97-99].  Porter testified that the January 23, 2012 email would not have been sent unless Couch had already told them that he was halting their activities. (App. 603 [Porter 103-104]).  Regardless of when Couch first told the Brokers of his decision, there can be no genuine dispute that Couch knew as early as October 2011 that he was not going to fund the program as described to investors in his offering materials

but nevertheless knew that his Brokers were continuing to sell those working interests to investors.[8]

When Couch finally did tell the Brokers to stop selling the investments and to wind up their activities (App. 572 [Couch III-74]; 554-555 [Couch I-94-95]), he told them that he planned to restrict the R9 Well Program to "institutional investors."  (App. 659 [Porter 99-101]; 573, 574 [Couch III-77-78; 87]).   The Brokers' email to current and prospective individual investors contained that statement and urged them to invest within three days or lose the opportunity. (App. 260). At least one investor decided to invest based on the email.  (App. 222-223, 260). Finally, by January 31, 2012, the Brokers had stopped selling the investments. (App. 470).

Defendants did not inform any investors, or prospective investors, between October 28, 2011, and January 23, 2012, that he intended to stop selling the R9 Well Program as described in the offering documents.  Defendants did not offer to rescind or refund any investor's money based on their decision to not raise the full amount of money.  (See App. 225).  Between October 28, 2011, and January 31, 2012, Defendants did not change any of the Offering Documents to reflect their intention to close the program, and the Brokers continued to use the brochures to sell the program until January 26, 2012.  (App. 222, 260, 272-287; 575 [Couch III-100]).  Moreover, there is no evidence that Couch actually intended to seek institutional investors, or that he had institutional investors, because Couch also testified that he intended to borrow money in order fund the balance of the program. (App. 575 [Couch III-98]).  Regardless, there can be no genuine dispute that Couch failed to tell investors (either existing or the new investors obtained after

---

[8]     For example, the $2.35 million was deposited into COG accounts (App. 470), and Couch knew the Brokers were being paid their commissions on these sales. (See App. 622 [Couch Depo. 202]).

October 2011) that he was not going to fund the program in the manner in which he told them he would to fund it. (*Id.*).

In addition, after making the decision to close the R9 Well Program, Couch bought a workover rig with the R9 Well Program funds. (App. 474).  Defendants made this purchase in December 2011 with money obtained from investors in the R9 Well program after Couch's meeting with the Commission.  (App. 470; 572 [Couch III-74]).  As a threshold matter, this type of expense, according to the brochure, should have been included as part of the $2.5 million "contribution" by Defendants to the program instead of coming from investor proceeds.  (App. 073).  Moreover, Couch uses this rig in a separate servicing well business that has no connection to 59 Well and R9 Well Programs.  (App. 569a-570 [Couch III-56-59]).  And Couch admits he has not used that revenue to help compensate the R9 Well Program investors for using their money to buy the rig.  (App. 570 [Couch III-59]).

**E.    Defendants misrepresented both programs to investors.**

Investors were misled in many ways about both programs.  First, Defendants represented in the Offering Documents that they were selling fractional units of the working interest in the wells in each program.  (App. 001, 077).  But, as discussed above, Defendants retained the title to the working interest in the wells and have not conveyed any assignment of interests to the investors.

Second, Defendants represented to investors that the funds they were raising covered the drilling costs of the wells in each program.  (App. 160; 073).  Instead of using all the funds for that purpose, Defendants spent the raised funds on non-drilling expenses.  One of these non-drilling expenses was the 30% commission paid to the Brokers for successfully signing up investors.  (App. 474).  Other undisclosed expenses on which investor funds from both programs

were used included $587,000 to buy a new workover rig in 2011 (App. 474); expenses of other drilling programs (App. 472-473; *see* 616-617 [Couch Depo. 147-149]); general corporate expenses not allocated to the various drilling programs (App. 469-470, 474-475; 619 [Couch Depo. 158-159]).  The use of investor funds in this manner was inconsistent with how Defendants' brochures promised investors their money would be spent.

Third, Defendants represented that their program was low risk because they were drilling in areas of "proven reserves," and that they would achieve minimum production rates of 270 to 282 barrels of oil per day (in both programs).  In fact, Defendants had no basis for making such representations. The Commission retained an expert witness, Dr. Richard Strickland, a consulting petroleum engineer, who analyzed Defendants' statements, and researched the wells and fields where Defendants were drilling.  He opined that Defendants' representations about the production estimates were false or without valid basis.  He also opined that reasonably prudent operators would not have made the projections Defendants made.  Defendants' specific misrepresentations as to production estimates and Dr. Strickland's opinions are discussed at length below, *infra* at Section IV.C.3, page 35 *et seq.*

Fourth, investors in the R9 Well Program were further told that Defendants were successful and experienced with radial jet drilling. These statements were material, as they bolstered the impression that the R9 Well Program would be successful due to the use of this technology.  But these statements were false.  Couch made the statements about his prowess with this technology in the brochure.  But in later testimony and emails, Couch's description of his struggles with the technology revealed that he was not as successful that he indicated in the R9 Well Program brochure.

Finally, as is also discussed above, Couch made the decision to stop raising funds after the October 28, 2011 meeting with the Commission, but failed to disclose that to investors, and failed to act on it, until after Defendants had obtained another $2.4 million in investor funds.  He also waited to disclose his decision until after he had purchased a workover rig with investors' funds, which he then used in his well servicing company business—unrelated to the R9 Well Program.  He also affirmatively misrepresented that he was limiting the R9 Well Program to only institutional investors.  Based on the representation that individuals had a limited time to invest before the program closed, at least one investor invested $200,000.  (App. 221-222, 260, 289-296).

## IV.
## ARGUMENT AND AUTHORITIES

**A.**      **As a threshold matter, the investments in this case were securities, and therefore Defendants' first affirmative defense is without basis in fact or law.**

Defendants assert in an affirmative defense that the interests they sold were not securities because they were instead joint ventures.  The undisputed facts, however, overwhelmingly show that investors were offered fractional units of the oil and gas working interest in each well, which are securities.  Indeed, Couch himself admits that investors were not investing in a partnership, but were instead obtaining working interests in wells.  (App. 545 [Couch I-65]).

Also, the investments at issue here were decidedly not joint ventures for other reasons. The investors did not receive the required documents, and Couch admits that he did not have the investors sign a joint venture agreement.  But even if the investors had received the requisite documents, the investment satisfied all of the Fifth Circuit's factors for determining when a joint venture is in fact a security under *Williamson v. Tucker.*

1.     **Defendants sold fractional units of the oil and gas working interest in the wells.**

Fractional interests in oil and gas working interests have long been held to be securities. The statutory definition of "security" includes "fractional undivided interest in oil, gas, or other minerals rights."  Securities Act, § 2(1) [15 U.S.C. Sec. 77b(1)]); *also, e.g., Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 546-47 (6th Cir. 2012) (holding that it was unnecessary to apply the *Howey* test to an oil and gas working interest, as the Securities Act's definition of "security" included "fractional undivided interests in oil, gas, or other mineral rights"); *Adena Exploration, Inc. v. Sylvan*, 860 F.2d 1242, 1249 (5th Cir. 1988); *Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093, 1098 (5th Cir. 1973); *Moses v. Michael*, 292 F.2d 614, 618-19 (5th Cir. 1961); *see also Bayoud v. Ballard*, 404 F. Supp. 417 (N.D. Tex. 1975) (citing *SEC v. C.M. Joiner Leasing Co.*, 320 U.S. 344, 351 (1943)).

Defendants' documents repeatedly state that the investor is purchasing a fraction of the working interest in each well in the drilling program. The cost summaries in the brochures for each program show the cost of a "1% working interest participation" in each program. (App. 160, 073).   The R9 Well Program brochure also contained this statement:

> The company diversifies the development of its properties by offering a portion of the *ownership in each well* to third party investors and retains a portion of the prospect for its own account. The prospects are then bundled into multi-well investments.  This strategy of *shared ownership* in multiple wells provides investment opportunities that minimize risk while seeking superior returns for Couch Oil and it's [sic] partners.

(App. 070) (emphasis added).  In addition, the subscription agreements for each program contained multiple references to the fact that the investor was purchasing a "working interest" in the oil wells. (App. 001, 076, 077).  Not surprisingly, based on these

documents, investors believed they were purchasing working interests in the wells. (App. 148, 190, 193, 207, 223).

And, Couch also admits that the investors purchased a working interest in the wells:

Q       Okay. And if they [investors] decided to invest, what was the
        structure of the investment?
A       It's a joint -- just a joint venture.
Q       Okay.
A       They own -- they would buy working interest in the
        well.
Q       **Are they buying working interest or are they buying
        a partnership interest?**
A       **Working interest.**
Q       Okay. So their -- they individually would own
        working interest in these nine wells?
A       Right.
Q       Okay. So there was no general partnership which
        they, which any of the investors belonged to?
A       **They would actually own individual interest in the
        wells.**

(App. Couch-I-65) (emphasis added).  It is undisputed that the Defendants sold a working interest, which meets the definition of a "security."

**2.      Defendants did not provide investors with joint venture documents.**

Defendants' affirmative defense that the interests they offered were joint venture interests, and not securities, fails for other reasons.   The defense is based the Private Placement Memorandum ("PPM") that Couch drafted for each program, which referred to the investment as a joint venture.  But it does not appear that investors received a PPM. (App. 148, 190, 193, 207, 223-224).  As discussed above, the Commission has not found an investor who received a PPM. (App. 475-476, 482-483).

The PPM Couch drafted stated that a copy of the Joint Venture Agreement was attached

as Exhibit "A."  (App. 008, 085; 595-596 [Couch Depo. 24-25]).  But investors did not receive or

sign a joint venture agreement. (App. 190, 193, 207, 224).  Indeed, Couch admits that the

investors did not sign a joint venture agreement:

> Q   The last sentence [on page 1 of the PPM, at App. 085] says all venturers will be
> obligated to enter into the capital J Joint, capital V, Venture, capital A, Agreement
> defined as the agreement in substantially the form described herein and attached
> hereto as Exhibit A.
> And my question is simply, did that happen? Did investors enter into the joint
> venture agreement as described in your document prior to or at the time they
> made their investments or thereafter?
>
> A   The wording of that is we typically do like a JOA, joint operating agreement, and
> that's usually attached to this if we –and we don't—**I do not have it attached.**
> …
>
> Q   … but you never sent the investors something that was titled Joint Venture
> Agreement. Is that right?
> A   It depends on the project.
> Q   On this project.
> A   **No, not on this one.  I did not.**
> Q   There were prior projects where you did?
> A   Like we do an industry deal just to – it was Copious 1984.
> Q   Was that with individual investors or was that with another company?
> A   Another company.
> Q   **Why didn't you send investors in Radial in the Permian Basin 9 Well
> program joint venture agreements?**
> A   **Because it would just complicate matters because they didn't understand it.** I
> had tried in the past, and it's like a 50-page document.

(App. 583-584 [Couch III-155-158)] (emphasis added)).[9]  If none of the investors had the PPM,

which tells them their investment is a joint venture, and if Couch did not have them sign a joint

venture agreement, it is necessarily impossible for investors, as purported joint venturers, to

know that they are in a joint venture or to exercise their purported rights as joint venturers.[10]

---

[9]      In addition, the Commission subpoenaed joint venture agreements from Defendants during the
investigation. (App. 482-483, 493).  Defendants responded saying they did not exist. (App. 484, 509).

[10]     The only document investors signed was a subscription agreements, which stated the investor was
purchasing a working interest in the program's wells. (App.  001-007, 075-084; 584 [Couch III-159]).

### 3. Regardless of what investors received, the investment is not a joint venture under the *Williamson* factors.

Even if evidence existed that investors had received the PPM, the investment is still not a

joint venture. Defendants' investments satisfied the factors under the Fifth Circuit's test in

*Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981), for determining when a joint venture is

security and not a general partnership. In *Williamson*, the Fifth Circuit established the test to

determine whether investors in a joint venture depended on the efforts of others and therefore

invested in a security, rather than a general partnership.[11] The Fifth Circuit held that a joint

venture is a "security," if any one of the following three factors is present:

> (1) The agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership;
>
> (2) The partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; *or*
>
> (3) The partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.[12]

*Id.*, at 424. The presence of only one of these factors will make the investment a "security," and

bring it within the ambit of the federal securities laws. *Id.* Further, in evaluating whether an

interest is a security, "form should be disregarded for substance," and courts should analyze the

"economic reality underlying a transaction, and not [focus] on the name appended

---

[11]     This test is based on the third element of the Supreme Court's definition for determining when an "investment contract" is a "security" under the federal securities laws. In *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946), the Supreme Court held that an "investment contract" is a security when: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves. *See also* Sections 2(a)(1), Securities Act [15 U.S.C. § 77b(a)(1)]; 3(a)(10), Exchange Act [15 U.S.C. § 78c(a)(10)]. A "joint venture" is necessarily an investment of money in a common enterprise (thus meeting the first two *Howey* elements), but whether it is a "security" depends on the third element of the *Howey* test--whether the investors were dependent on the efforts of others for their expected financial return. It is this third element that *Williamson* addressed.

[12]     These factors are not exhaustive. *Id.*, at 424 n. 15.

thereto." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 848–49 (1975).  When the

*substance* of a joint venture or general partnership interest demonstrates that the interest is

actually a security, a court should not hesitate to grant summary judgment for the Commission

on this issue.  *See, e.g.*, *SEC v. Schooler*, 2014 WL 1660651, at *9 (S.D. Cal. Apr. 25, 2014)

(granting summary judgment for the Commission on the first *Williamson* factor).

    All three factors are present in Defendants' offerings.

    As to the first *Williamson* factor, Defendants' "joint ventures" left little power in the

hands of the investors, such that the arrangement was effectively a limited partnership.

Defendants also did not disclose the identity of the program's investors to the other investors,

thereby making it impossible for investors to coordinate, act collectively, and communicate

about their purported joint venture, such communication being essential to exercising joint

venture powers.  (App. 149, 193, 208, 224).  Defendants emailed updates to investors, but always

by "blind copy", which prevented the recipients from seeing the names and email addresses of all

the other investors who received the updates. (*See, e.g.,* App. Ex. 7, 260).  The investors were

widely scattered across the country, and not in geographical proximity to each other, making it

more difficult for them to act collectively.  (App. 471).

    Also, investors had no access to essential information that would have permitted them to

meaningfully exercise any managerial powers.  Their sole source of information about the

drilling programs was Couch's periodic updates on the progress of Defendants' activities, after

the fact.  Investors had no access to COG's financial information.  (App. 224).  Once they

invested, their funds went into COG's operating account at Amegy Bank.  Only Couch and his

accounting manager saw the bank statements and had signature authority on that account.  (App.

608, 622 [Couch Depo. 113-114; 202]).  Defendants did not provide investors with any real-time

financial information.

The investors considered themselves to be "passive."  (App. 149, 190, 193, 207, 223).

But significantly, Couch also considered the investors to be passive:

> Q     And you said -- are they general partners or
>        limited partners?
> A     Well, we -- we show them as general partners under
>        a, under a separate federal ID so that they can get -- they
>        are not -- **I've tried to limit them to their exposure on**
>        **liability because I'm the manager.**
>        When anybody looks at it, I'm it. But I give them
>        over in their general partnership, I give them direct
>        ownership.
> Q     Do they have any duties or responsibilities in
>        terms of the management of Couch Oil or the oil and gas
>        fields?
> A     Most of them come out and visit, **but no management.**
>        …
> Q     Or had any meetings of all of the general partners?
> A     Usually most of them come out. I have one-on-one
>        meetings. I recommend everybody come out to see.
> Q     I mean as a partnership, do they have --
> A     No, no.
> Q     Have -- have they held any votes to continue to --
> A     **No, no. I have power of attorney too.**
>        …
>
> Q     So they are called general partners it sounds like
>        for tax purposes, but it sounds like they function like a
>        limited partner?
> A     It's a -- yeah, **it's a passive investment.**

(App. 545-547 [Couch I-65-67]) (emphasis added)). (*See also* App. 581 [Couch III-134-135]).

Thus, without a joint venture agreement, knowledge of the identity of the other investors,

knowledge about the drilling activities, or financial information, the investors certainly held so

little power that they were effectively limited partners, not joint venturers. These investments

satisfy the first *Williamson* factor.

The second *Williamson* factor is also present because many of the investors were

inexperienced in the oil and gas business.  (App. 190, 193, 221).  As the Fifth Circuit stated, a

scheme "which sells investments to inexperienced and unknowledgeable members of the general

public cannot escape the reach of the securities laws merely by labeling itself a general

partnership."  *Williamson*, 645 F.2d at 423.  Defendants' investors generally did not have

petroleum industry experience.[13]  Moreover, Defendants sold the drilling programs through

general solicitation, seeking investors on the internet.  (App. 650 [Porter 31-32]).  An offering

made to a broad segment of the public weighs against a finding that an investment was a joint

venture.  *See Reves v. Ernst & Young*, 494 U.S. 56, 68 (1990); *SEC v. C.M. Joiner*, 320 U.S. 344,

at 353 (an important factor in determining whether a transaction is an investment contract is

whether the interests at issue were "offered and sold to a broad segment of the public").

Defendants' offerings also satisfied the third *Williamson* factor:  the investors were

dependent on the managing partner's unique experience and ability in running that particular

business.  *Williamson*, 645 F.2d at 423.  The investors, without any petroleum industry drilling

experience, were dependent on Defendants to manage and operate the drilling program.  The

brochures for each program led investors to believe that they were making a passive investment

and encouraged them to rely on Defendants, with their extensive, and self-proclaimed successful,

experience in the petroleum business, to manage, operate, and generate the expected profits:

- "Couch Oil & Gas, Inc. is a seasoned oil and natural gas extraction company owned and operated by Charles Couch. Since 1967 Charles has drilled and/nor participated in the drilling of over 600 wells in Texas and Louisiana."

- "Couch Oil & Gas has worked or is currently working directly with most major national and international companies ….", citing Kerr-McGee, Exxon, and Texaco among others.

---

[13]     For example, the investors from whom the Commission obtained declarations in support of this motion included a retired insurance agent, a former mortgage company owner, a farmer, a retired general contractor, and a retired merchant marine. (App. 144, 189, 192, 206, 220).

- "Couch Oil will drill and manage all Texas wells with in house staff and equipment."

(App. 061, 065). The investors expected Defendants to manage and operate the program without input from them and relied on Defendants' representations as to their extensive experience. (App. 149, 190, 193, 207, 223). The third *Williamson* factor is also satisfied.

Based on the presence of all of the *Williamson* factors, as well as Couch's own admission that the investors were passive, there is no genuine issue on this point: the investments were not joint ventures. Thus, the Commission is entitled to summary judgment in its favor on this affirmative defense.

**B.      The Court should grant summary judgment on the Commission's third claim that Defendants offered and sold securities in unregistered offerings, without an exemption.**

The second ground of the Commission's motion is that it is entitled to summary judgment on its third cause of action because Defendants offered and sold securities through unregistered offerings without a valid exemption, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)]. Both of these statutory provisions prohibit the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972).

**1.      The Commission has established a *prima facie* Section 5 violation.**

Section 5 operates as a strict liability statute. *Swenson v. Engle,* 626 F.2d 421, 424 (5th Cir. 1980). A defendant's intent is irrelevant. Thus, the Commission does not need to prove that Defendants knowingly, recklessly, or even negligently committed the violation. *Id.*; *see SEC v. Holschuh*, 694 F.2d 130 at 137 n.10 ("good faith is not relevant to whether there has been a

primary violation of the registration requirements"). In order to establish a *prima facie* case for a violation of Sections 5(a) and 5(c), the Commission need only prove that: (1) defendants, directly or indirectly, offered or sold securities; (2) no registration was in effect or filed with the Commission for the offer or sale of those securities; and (3) interstate transportation or communication, or the mails, were used in connection with the offer and sale. *See* 15 U.S.C. §§ 77e(a) & 77e(c); *see Cont'l Tobacco*, 463 F.2d at 155. Once a *prima facie* case is established, the burden shifts to Defendants to prove that their acts fall within an exemption to Section 5. *Cont'l Tobacco*, 463 F.2d at 156.

The undisputed record shows that the Commission has proven all of the elements required to establish that the Defendants violated Sections 5(a) and 5(c). First, as described above in Section IV.A., the interests that were offered and sold by Defendants were securities. *See Adena Exploration, Inc.,* 860 F.2d at 1249; *Williamson,* 645 F.2d at 424; *see also SEC v. Shields,* 744 F.3d 633, 648 (10th Cir. 2014). Second, the offerings were not registered, as Defendants admitted so in their answer. (Answer, at ¶7 [Dkt. 21]). Defendants also advised investors of that fact in the subscription agreements. (App. 003, 079 [at ¶ 4(d)]). Finally, it is undisputed that the working interests were offered and sold through interstate commerce. Defendants sold to investors in 31 states in the 59 Well Program and 22 states in the R9 Well Program (App. 471), and used interstate communications and the mail to offer and sell the investments. (App. 514, 537, 541; *also* 144-145, 189, 192, 206, 220-221).

Thus, *prima facie* violations of Section 5(a) and 5(c) exist.

### 2. Defendants cannot meet their burden to establish an exemption from registration.

As the Commission has established the *prima facie* Section 5 violation, the burden of

proof shifts to Defendants to show the applicability of an exemption from registration.  *See SEC*

*v. Ralston Purina Co.*, 346 U.S. 119, 124-26 (1953); *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir.

1980).  Although it is not the Commission's burden to establish the absence of an exemption,

Defendants will be unable to prove they qualify for an exemption or that a fact issue as to one

exists.[14]

Exemptions from registration are construed narrowly "in order to further the purpose of

the [Securities] Act:  To provide full and fair disclosure of the character of the securities, and to

prevent frauds in the sale thereof."  *Cont'l Tobacco,* 463 F.2d at 155 (exempted transactions

must be "narrowly viewed" since the Securities Act "is remedial legislation entitled to a broad

construction").  The Securities Act and related regulations provide a number of exemptions from

Section 5's registration requirements, but most could not conceivably apply to Defendants

offerings.[15]  Addressed below are exemptions that Defendants might try to claim and why they

do not apply.

> a.     *Defendants cannot claim the private placement exemption.*

Defendants' offering does not qualify for the Securities Act's private placement

exemption.   Section 4(a)(2) of the Securities Act exempts "transactions by an issuer not

involving any public offering."  15 U.S.C. § 77d(a)(2).  The applicability of this exemption turns

on whether the particular class of persons affected needs the protection of the Securities Act.  *See*

*Ralston Purina*, 346 U.S. at 125; *Cont'l Tobacco*, 463 F.2d at 158 (describing this question as

---

[14]      Defendants admit in their Answer that they sold securities in an unregistered offering. (Answer, at ¶ 7 [Dkt. 21]). They did not plead the applicability of an exemption.

[15]      For example, Sections 3(a)(2) through 3(a)(8) of the Securities Act provide exemptions for government securities, commercial paper, securities offered by non-profit organizations, savings and loan securities, interests in railroad equipment trusts, indebtedness offered in bankruptcy, and insurance policies, respectively.  *See* 15 U.S.C. § 77c(a)(2), (a)(8).  None of these exemptions apply here.

the "ultimate test" in determining whether an offering was public or private).  In determining whether a securities offering should be exempt from registration, a court should examine whether the offerees "have access to the kind of information to which registration would disclose."  *Id.* at 127.  An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering."  *See id.* at 125.  "Stated another way, a limited distribution to highly sophisticated investors, rather than a general distribution to the public, is not a public offering."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1090-91 (9th Cir. 2010).

In evaluating whether the private placement exemption should apply, courts look at several factors, including:  (1) the number of offerees; (2) the sophistication of the offerees; (3) the size and manner of the offering; and (4) the relationship of the offerees to the issuer.  *See Cont'l Tobacco,* 463 F.2d at 158; *SEC v. Rose,* 2007 WL 7117887, at *6 (S.D. Tex., Mar. 23, 2007); *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984).  The primary factor, however, in qualifying for this exemption is the knowledge of the offerees.  *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 902 (5th Cir. 1980).

Applying each of these factors here, it is clear that Defendants made public, not private, offerings of securities, without any effort to reach only sophisticated investors.  First, the offerings were sold to a large number of investors—approximately 139 in the 59 Well Program and 65 in the R9 Well Program. (App. 470).  Moreover, the number of offerees—the focus of the inquiry for this exemption—substantially exceeded the number of ultimate investors.  With these numbers of offerees, Defendants' unregistered offer and sale of the working interests were public, rather than private, offerings.  *See Murphy*, 626 F.2d at 645-46 (stating that "the more offerees, the more likelihood that the offering is public" and finding that more than 400 offers "clearly suggests a public rather than a private placement").

Second, because Defendants used a general solicitation over the internet to attract potential investors (App. 144 [investor saw ad in publication], 189, 192, 206, 220-221), their sales efforts could not have focused on or targeted investors' business acumen to determine whether the offerees were sophisticated investors.  A general solicitation is sufficient to view this factor as weighing in favor of a public offering.  *See SEC v. Alternate Energy Holdings Inc.*, 2014 WL 2515710, at *10 (D. Id. 2014) (citing *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 11-12 (D.D.C. 1998) (holding that defendants did not qualify for exemption under this factor because it failed to show that the offer was not a general solicitation).  In addition, Couch claims that he had the Brokers screen the prospective investors for whether they were "accredited" but he and the Brokers did not screen for any other factors, such as business acumen or sophistication or oil and gas investment experience (App. 564 [Couch II-264]; 579 [Couch III-114-115]; 640 [Tuthill122-123]).

Third, the size and manner of the offerings show that the offerings were public.  Between June 2010 and January 2012, Defendants sought to raise $4.9 million and $7.5 million in two offerings.  (App. 160, 073).  The 59 Well Program raised $2 million more than its declared goal, while the R9 Well Program raised $2.8 million, short of its target of $7.5 million.  (App. 470).  These were not small offerings.  *See Murphy*, 626 F.2d at 646 (offerings of more than $1 million each cannot be labeled small).  The size of the offerings, combined with the manner of the offerings, through general solicitation on the internet, further demonstrates that the offerings were public.  *See Alternate Energy*, 2014 WL 2515710, at *10 (finding that large offerings that used advertising and outside help were public).

Finally, the undisputed record shows that the offerees did not have the kind of pre-existing relationship with Defendants that would have given them access to or disclosure of the

sort of information that a proper registration of the offerings would have revealed.  (*See* App. 148, 190, 193, 222).  A private offering is one in which the offerees do not need the protections of the Securities Act because they already have access to the kind of information available in a registration statement.  Here, Defendants did not provide offerees (or investors, for that matter) with financial statements, balance sheets, or other information that would be available in a registration statement.  (App. 190, 193, 223-224).  Couch admitted that he does not have audited financials; thus, he was incapable of providing the kind of financial statements available in registration statements.  (App. 622 [Couch Depo. 202-203]).

Accordingly, Defendants' offerings did not meet the requirements of the private placement exemption under Section 4(2) of the Securities Act.  *See Ralston Purina*, 346 U.S. at 125-127 (private placement exemption not available where there was no access to the kind of information registration would disclose).

### b.     Defendants cannot prove they qualified for any of the Regulation D exemptions.

Defendants also cannot establish that any of the exemptions under Regulation D under the Securities Act were applicable.  Regulation D contains "safe harbor" rules that exempt limited offers and sales of securities from registration.  It is comprised of four transactional exemptions:  Rule 504 and Rule 505 (adopted under Section 3(b) of the Securities Act), Rule 506(b) (adopted under Section 4(a)(2) of the Securities Act), and Rule 506(c) (adopted under Section 201(a) of the JOBS Act).[16]  Defendants' offerings did not qualify for any of these Regulation D safe harbor rules.

---

[16]     The exemption under Rule 506(c) did not become effective until September 23, 2013, approximately 20 months after Defendants ceased offering the R9 Well Program, and is therefore inapplicable here.  *See* SEC Release No. 33-9415 (July 10, 2103), available at http://www.sec.gov/rules/final/2013/33-9415.pdf.

First, Rule 504, which creates an exemption for limited offers and sales whose maximum aggregate offering price does not exceed $1 million, clearly does not apply because the offerings exceeded $1 million.  *See* 17 CFR § 230.504(b)(2).

Second, Rule 505 is likewise inapplicable.  That rule exempts limited offers and sales not exceeding a maximum of $5 million. In this case, the R9 Well Program offered $7.5 million in working interests. (App. 073).  The 59 Well Program offered $4,995,000 in working interests (App. 160), but Defendants actually sold $7.1 million in working interests.  (App. 470).  *See* 17 CFR § 230.505(b)(2).  Thus, neither offering is exempt due to their size.

Third, Rule 506(b) is also not available. *See* 17 CFR § 203.502(c); *Rabinovich & Assoc.*, 2008 U.S. Dist. LEXIS 93595, at * 13 (S.D.N.Y. 2008).  That exemption is only available for an offering if no more than 35 unaccredited investors who are sophisticated in business and financial matters purchase the securities *and* if each unaccredited investor is given detailed information about the issuer and the offering similar to that found in registered offerings.   17 C.F.R. § 230.506(b)(2); 17 C.F.R. § 230.506(b)(2) (A).  Further, issuers of offerings claiming this exemption must provide unaccredited investors with audited financial statements, or, in certain limited instances, only an audited balance sheet. 17 C.F.R. § 230.506(b)(2)(B)(2). Because the Defendants sold securities to unsophisticated non-accredited investors, did not have audited financial statements, and failed to satisfy these disclosure obligations, their offerings were disqualified from this exemption. (App. 190, 222).

Moreover, Defendants will be unable to prove, at least in the 59 Well Program, that they had fewer than 35 unaccredited investors required for this exemption.  (App. 480-482).  The Commission's review of the subscription agreements demonstrates that, while 89 of the 139 investors in the 59 Well Program affirmatively represented on their subscription agreement that

they were accredited,[17] 48 out of the 139 did not.  At least three affirmatively stated that they were unaccredited, and 25 left their status blank on their agreement. For the remaining 20 investors, Defendants did not any produce subscription agreements, and thus, there is no evidence that they are accredited. (*Id.*).

Based on the foregoing, the Commission is entitled to summary judgment on its cause of action that Defendants violated Section 5 of the Securities Act.  A prima facie case exists, and Defendants will be unable to prove the applicability of any exemption from registration to their offerings.

**C.      The Court should grant summary judgment on the Commission's first and second causes of action because Defendants violated the federal securities laws' antifraud provisions by misrepresenting and omitting material facts.**

As detailed in Section III above, the Defendants made a variety of material misrepresentations and omissions in connection with the offer and sale of securities.  Moreover, as discussed below, there can be no genuine dispute that they did so knowingly or, at a minimum, with extreme recklessness.  Likewise, the undisputed evidence establishes that Defendants acted negligently, if not intentionally.  Consequently, Defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Section 17(a) of the Securities Act [5 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of any security.  To establish a *prima facie* case under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, the SEC must prove by a preponderance of the evidence:

---

[17]      Of these 89 who stated they were accredited, the Commission believes that there may be a number who were not in fact accredited.  The Commission is aware of at least one investor who stated that he was told to state that he was accredited, when in fact he was not, because that question was "not important."  (App. 222; 480-482).

(1) a material misrepresentation, omission of material fact, or other fraudulent device; (2) in the

offer or sale, or in connection with the purchase or sale, of a security; (3) with the requisite

mental state.  *E.g., Aaron v. SEC,* 446 U.S. 680, 695 (1980); *SEC v. Gann,* 565 F. 3d 932, 936

(5th Cir. 2009); *SEC v. Seghers,* 298 Fed. Appx. 319, 327 (5th Cir. 2008).[18]

If the Court finds that the working interests were securities, as discussed in Section IV.A.

above, the second element under the antifraud provisions is satisfied:  that the statements, or

omissions, were made in connection with the offer, purchase, or sale of securities.  (*See supra*

Section IV.A.)  The Commission must then establish the first element, that Defendants made

material misrepresentations or omissions, or used a fraudulent device, and the third element, that

Defendants acted with the requisite mental state.

The standard for determining the existence of a material misrepresentation or omission,

or the use of a fraudulent device, is clear:

> …the standard for misrepresentation is whether the information disclosed,
> understood as a whole, would mislead a reasonable potential investor. [And a]
> statement or omitted fact is material if there is a substantial likelihood that a
> reasonable investor would consider the information important in making a
> decision to invest.

*SEC v. Provident Royalties, LLC*, 2013 WL 5314354, at *4 (N.D. Tex. Sept. 23, 2013)

(quoting *SEC v. Seghers,* 298 Fed. Appx. 319, 328)); *see S.E.C. v. Gann,* 565 F.3d 932,

937 n.17.  Liability arises not only from affirmative representations but also from failures

to disclose material information.  *SEC v. Dain Rauscher*, 254 F.3d 852, 855-56 (9th Cir.

2001).  "An omitted fact is material 'if there is a substantial likelihood that the disclosure

of the omitted fact would have been viewed by the reasonable investor as having

---

[18]     The Defendants' conduct must also have been in interstate commerce. As discussed above, that element is undisputed.  *See supra* Section IV.B.1, at page 23.

significantly altered the total mix of information made available.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 at 1092 (quoting *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007)). *See also Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *Gann*, 565 F.3d at 937 n. 17.

In other words, a misrepresentation, misstatement, or omission is material if there is a substantial likelihood that a reasonable investor would consider the true or complete information important in making an investment decision.  As such, the antifraud provisions of the securities statutes and regulations impose a "duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992).

The Commission must also show that Defendants acted with the requisite mental intent, or were negligent.  Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require a showing of *scienter*, or severe recklessness.  *Aaron,* 446 U.S. at 697; *SEC v. Southwest Coal and Energy Commission*, 624 F.2d 1312, 1320-21 & n. 17 (5th Cir. 1980); *SEC v. Brooks*, 1999 WL 493052, at *2 (N.D. Tex. July 12, 1999) (Fitzwater, J.).  *Scienter* under Section 17(a) and Section 10(b) is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Brooks*, at *2 n. 6.  "Severe recklessness" is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (*en banc*); *Southwest Coal*, 624 F.2d at 1321 n.17; also *Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997).

The Commission alleged in its Complaint at least five categories of material misrepresentations contained in, or material omissions from, the offerings, any one of which supports its claims.  (Complaint, at ¶¶ 19-40 [Dkt. 1]).  As discussed below, no genuine issue of material fact exists as to the false or misleading nature of these misrepresentations and omissions, their materiality, and the fact that Defendants had the requisite mental intent.

1.    **First misrepresentation/omission:  Defendants misrepresented the nature of the interests that investors were purchasing.**

As discussed above, Defendants were undeniably selling fractions of working interests in the oil wells in each drilling program.  *See supra* Section IV.A.1, at pp. 14-16.  This was a misrepresentation that Defendants made with *scienter*.  It is undisputed that Couch did not transfer ownership in the working interest to the investors and that COG retained title to the working interests.  (*Id.*; App. 580, 581, 585, 590-591 Couch III-124; 133-134; 171; 232-233]). It is undisputed that Couch has been in the oil industry for more than four decades; he knows that a subscription agreement does not convey ownership in the working interest.  Couch obtains his own working interests through assignments.  (App. 606 [Couch Depo. 105-107]).   But he did not execute any assignments to the investors, who received no document assigning them their working interests.  (App. 190, 193, 223).

A misrepresentation as to the nature of the security offered to investors is material.  *See SEC v. Marker*, 427 F. Supp. 2d 583, 589 (M.D.N.C.  2006) (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc*., 936 F. 2d 759, 761 (2d Cir. 1991); *see also SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982) (finding that "information concerning the true ownership of [investment properties] would have been important to the offerees in making their investment decisions); In this case, the investors were offered working interests, but never received them;

COG retained title to all of the working interests.  (App. 580 [Couch III-124]).

There is no genuine issue as to any material fact that Defendants misrepresented to investors what they would receive and did so intentionally.

**2.     Second misrepresentation/omission:  Defendants misrepresented the use of funds.**

Defendants also misrepresented their use of investors' proceeds.  The brochure for each offering indicated that the drilling costs for each program were "turnkey," meaning that the figures represented the total amount to drill each well in the program, and included a chart that told investors the cost of the program, the amount of funds needed from investors, and the value of Defendants' contribution to the program.  (App. 073, 160). For example, the R9 Well Program brochure informed investors that the drilling program would cost $10,000,000, that $7,500,000 would be raised from investors, and Defendants' contribution would be $2,500,000.  Defendants told investors exactly how their money would be spent:  according to Defendants' representations, all of the money raised from investors would be applied towards paying the turnkey costs of drilling the wells.  (App.  073).  The same type of chart is present in the 59 Well Program brochure.  (App. 160).

Contrary to these promises, the evidence is undisputed that Defendants used investors' funds to pay for non-drilling-related expenses.  For example, Defendants paid the Brokers 30% of the investors' money. (App. 469-470, 474; 564 [Couch II-264]).  And, Couch admits he did not tell the investors of these payments to the Brokers.  (App. 582 [Couch III-149-150]).  It is also undisputed that brochures do not disclose those payments.[19]  (*See* App. 059-074; 151-162).

---

[19]     The brochures and subscription agreements were silent as to the use of brokers and the substantial fees they received.  Defendants may argue that the PPMs disclosed the possibility of COG using FINRA-licensed brokers to sell interests in the program.  Even assuming the PPM was actually delivered to an actual investor, this would not

This information was material to the investors.  (App. 149; 191; 194; 224).  Defendants and the Brokers entered into this arrangement before the 59 Well Program was offered, so Couch knew before these two programs were offered that 30% of the investors' proceeds would be siphoned off for non-drilling expenses. (App. 565 [Couch II-266]).  Non-disclosure of a 30% commission is material as a matter of law because it would be impact the investor's assessment of the strength of a potential investment. *SEC v. Alliance Leasing Corp.*, 2000 WL 35612001, at * 10 (S.D. Cal. 2000).

In addition, as discussed above, another expense from R9 Well Program funds was the $587,000 of investor funds Defendants used to buy a new workover rig in 2011.  (App. 474; 560a [Couch I-190]).  Defendants made this purchase in December 2011 with money obtained from investors in the R9 Well Program after Couch's meeting with the Commission, after which Couch decided to stop the fund-raising in the R9 Well Program.  (App. 572 [Couch III-74]; 474).  As a threshold matter, this type of expense, according to the R9 Well Program brochure, should have been included as part of the $2.5 million "contribution" by Defendants to the program, instead of coming from investor proceeds. (App. 073; 160).  Moreover, Couch uses this rig – bought with R9 Well Program investors' money – in a separate business servicing wells that have no connection to this case.  Couch admitted he has never used any of that revenue to help compensate the R9 Well Program investors for using their money to buy the rig.  (App. 570 [Couch III-59]).  Couch knew of the representations made to the investors, but nevertheless purchased the workover rig with their funds; his actions were done with *scienter*.

---

excuse Defendants payments to the Brokers.  First, the PPM represented that only 15% of the proceeds would be spent on this non-drilling purpose when in fact 30% was paid.  Second, the PPM only discussed the possibility of any payments to brokers, when in fact Couch knew such payments were being made.  Finally, the representation that only FINRA-licensed brokers would be used to sell the offerings was false.  The Brokers were not FINRA-licensed. (App. 483).  In fact, Couch did not even know if the Brokers were licensed.  (App. 623 [Couch Depo. 215]).

In addition, Couch placed all investor proceeds into COG's general operating account, from which he paid all COG expenses, not just those related to the two programs at issue here. (App. 607 [Couch Depo. 112]).  Defendants failed to track all of the expenses in each program (App. 472-473; *see* 616-617 [Couch Depo. 147-149]); failed to allocate their general corporate expenses between and among the various drilling programs (App. 619 [Couch Depo. 158-159]); and failed to track Defendants' capital contributions to any drilling program (App. 474; *see* 619 [Couch Depo. 157-159]). Defendants paid whatever expenses there were out of the general operating account, without regard as to which drilling program the expenses were attributable. (App. 469-470; 474-475).  In the Commission's bank analysis, expenses associated with other drilling programs, such as buybacks and rescission payments to investors in earlier programs, unrelated legal and accounting fees, and loan and credit card payments unallocated among the drilling programs and unrelated to these two programs, were paid for with the funds from the investors in these two programs. (App. 469-475).  Using investor funds in this manner was inconsistent with how Defendants' brochures promised investors their money would be spent.[20]

It is well established that misrepresentations and omissions related to how investor funds are spent are material, as any investor would want to know that information.  *See SEC v. Research Automation Corp.*, 585 F. 2d 31, 34-35 (2d Cir. 1978) (misrepresentations about how investors' money was used were material); *SEC v. Aronson*, 2013 WL 4082900, at *8 (S.D.N.Y. Aug. 6, 2013) (misstatements regarding use-of-funds agreements are material as a matter of law; such statements are "so obviously important to the investor, that reasonable minds cannot differ on the question of materiality").

---

[20]     It is difficult to identify in more detail precisely how Couch spent the investor funds because his accounting records are incomplete.

Thus, there is no genuine issue as to any material fact as to how the investors' funds would be used.

### 3.    Third misrepresentation/omission:  Defendants materially overstated the oil production that they  would or could produce and the ultimate rate of investor return.

Defendants made multiple misrepresentations in the brochures for each program regarding estimated oil production and investment returns.  Each of these misrepresentations was material because they related to the ultimate return on the investment.  *See SEC v. Tecumseh Holdings Corp.,* 765 F. Supp. 2d 340, 350-352 (S.D.N.Y. 2011) *(*finding profit projections were materially false); *SEC v. Haligiannis,* 470 F. Supp. 2d 373 (S.D.N.Y. 2007) (misrepresentations grossly exaggerating the fund's performance were material).  Even if a genuine issue of material fact existed as to the materiality of an individual statement, the cumulative effect of these misrepresentations was to falsely present each program as a low-risk, high-return investment.

The Commission's expert witness, Dr. Richard Strickland, has demonstrated this fact.[21] (App. 297-410).  Dr. Strickland's conclusion is that Defendants' brochures used language and numerical values that described the drilling of the wells, the expected volumes of oil production, and economic returns in these two programs as a low-risk venture, when it fact the opposite was true.  (App. 329-330).

Defendants' misrepresentations as to estimated volumes of oil production and ultimate recovery were material because they directly related to the ultimate returns investors could expect to receive.  The misrepresentations, as Dr. Strickland demonstrates, were not made in accordance with industry standards and were not statements that a reasonably prudent operator

---

[21]     Dr. Strickland reviewed the two program brochures, Couch's investigative testimony and the documents produced by Couch. In addition, he conducted his own research on Defendants' wells and thousands of others in the six West Texas counties where Defendants' wells are located.  (App. 310).

would have made.  Couch touted his 45 years of oil industry experience (App. 009; *see also* 144, 146, 163), and therefore it can be considered undisputed he is well-versed in industry standards. Thus, he knew, or was extremely reckless in not knowing, and therefore acted with *scienter*, in presenting to investors false production estimates not made in accordance with industry standards.  At a minimum, Couch's actions were negligent.

There is no genuine issue as to false or misleading nature of Couch's misrepresentations, as Dr. Strickland's report and conclusions are *unrebutted.*  (App. 514).  Defendants did not designate an expert witness (*Id.*); nor did they file any rebuttal report of Dr. Strickland's testimony by the Court's deadline to designate rebuttal experts. (Scheduling Order [Dkt. 16]; Order [Dkt. 19] (extending deadlines)).  Nor did Defendants take Dr. Strickland's deposition. (App. 514).  As discovery has now closed, Defendants cannot contradict Dr. Strickland's report or any of his conclusions and opinions.

The misrepresentations in Defendants' brochures discussed below are only a some of the ones discussed by Dr. Strickland in his report.

**Misrepresentations in both brochures.**

One of the main categories of misrepresentations in Defendants' brochures was Defendants' definitive statements about reserves and the certainty with which Defendants "will" find oil and produce it.  These statements appeared with no discussion of risk.  Specifically, the brochures for both drilling programs contained the following statements about the reserves that COG would be drilling into:

- "Couch Oil has obtained proven undeveloped productive oil zones within existing oil fields in West Texas."  (App. 062; 151).

- "Because we are drilling into existing and proven oil fields, we should find significant oil reserves within each field."  (App. 063).

- "We will find fairly significant oil reserves." (App. 152).

Dr. Strickland stated that these representations, taken together, paint a clear picture of low risk. (App. 308). As he explained, "An experienced and prudent oil and gas operator knows that proved reserves have a specific definition, with the important concept of a reasonable certainty of recovery. An investment in a project to produce proved reserves should be low risk and not a research project." (*Id.*). Implicit in each brochure, Dr. Strickland said, is the idea that "sound engineering and geological judgment was used in developing values and value statements about proved reserves. As discussed further in the following sections [in his report] this was not the case." (App. 309). As Couch has extensive oil industry experience, he knew these statements in the brochures were misleading.

Dr. Strickland first analyzed Defendants' statements about the "planned total production." (*Id.*). In the 59 Well Program, Defendants projected the wells would produce collectively 270 to 1580 barrels of oil per day ("bopd") (App. 151), and 282 to 672 bopd in the R9 Well Program. (App. 062). Dr. Strickland tested these statements by compiling production data from wells drilled in a six-county area where Defendants' wells are located. (App. 310; 390 [Strickland Report Appendix D]). Dr. Strickland found 3,973 wells drilled in these six counties after January 1, 1990; he further identified a smaller subset of 140 wells drilled in a 20-mile square area centered on Defendants' Guy No. 1 well.[22] (*Id.*) The initial production for the 140 well-subset had an average initial rate of production at about 10 bopd, which declined rapidly. (App. 310-311). This actual well behavior in the vicinity of Defendants' proposed locations

---

[22]      Dr. Strickland limited his search to wells drilled after 1990 because the fields in which Defendants proposed to drill the program wells were in existing fields that were partially or totally depleted. (App. 310).

contradicted Defendants' representations in both brochures that the wells Defendants proposed to drill "will" yield substantially higher volumes.  This blatant misrepresentation by Defendants was material because Defendants' revenue projections were tied to misleadingly optimistic initial flow rates, with no recognition of real initial flow rates in the vicinity, and no recognition of the rapid decline of such rates, once a well was produced.   (App. 311)

Dr. Strickland stated, "Sound engineering and geological judgment is required when analogs are used for estimates of initial production." (*Id.*).  He considered Couch's testimony, in which Couch stated, "We were just picking comparable wells, the best comparable wells."  (App. 311-312; 587 [Couch III-189]).  Using results from the best wells as a comparable for a new well was not sound engineering judgment, according to Dr. Strickland, who said that one should at least use an average of the analogous wells.  (App. 312).  Dr. Strickland stated, "Picking the best well to use as a comparable is not the action of a reasonably prudent operator."  (App. 312).

In addition to the projections of the new wells' estimated production, Defendants' brochures also misrepresented the ultimate recovery of oil.  Both brochures told investors the following:

- "Each Texas well most likely will produce an average of 150,000 to 250,000 barrels of oil."  (App. 064).

- "Because we are drilling into existing and proven oil fields, we should find significant oil reserves within each field."  (App. 063).

These promises had no basis in reality, as Couch, with his decades of oil industry experience knew, or at least was reckless in not knowing.  Dr. Strickland tested these statements against wells in the same six-county area he reviewed to analyze actual initial production rates.  Out of the 3,973 wells in the six-county area drilled since January 1, 1990, he found only 15 (roughly .375%) that had achieved cumulative oil production greater than 150,000 barrels. (App. 312).

Moreover, out of all 3,973 oil wells in the six-county area, the mean cumulative oil production was only 58,265 barrels—less than one-third what Defendants represented. (App. 313).  The median well in this data set produced only 13,488 barrels over its lifetime. (*Id.*).  The 140 wells in the subset in closer proximity to Defendants' wells had average cumulative production of only 20,000 barrels.  Dr. Strickland's conclusion was:

> For the six county area where Couch Oil and Gas was drilling wells in the 2009-2012 time frame, stating that the well will 'most likely produce an average of 150,000 to 250,000 barrels of oil' is *optimistic to the point of absurdity* and not the actions of a reasonably prudent operator.

(*Id.*) (emphasis added).

### Misrepresentations specific to the 59 Well Program brochure.

The misrepresentations in the 59 Well Program brochure begin, as noted by Dr. Strickland, with the title: "Permian Black Shale-Fifty Nine Well Program."  Dr. Strickland noted that "black shale" is not an industry standard term, and Defendants' wells are outside the well-known Permian Basin.  (App. 306, 321, 322).  Only two of the six counties in which Defendants were drilling are arguably in the Eastern Shelf area of the Permian Basin; the other four counties where Defendants' wells are located are in another structure—the western shelf of the Fort Worth Basin.  (App. 321).  By attaching the well-known term "Permian" to his program, Couch was trying to make his programs sound more attractive.

The 59 Well Program brochure also misrepresents the estimated production from the wells in that program.[23]  Dr. Strickland checked the initial tests of these wells on the W-2 forms operators must file with the Texas Railroad Commission. (App. 322).  The actual initial

---

[23]     The 59 Well brochure does not identify the wells by name, but Couch had specific wells in mind for this program.  One investor, Larry Hollar, obtained the names of the wells from the salesman he spoke to and wrote them down on his copy of the brochure.  (App. 146-147, 151).

production ("IP") according to the filed W-2 reports, compared with Defendants' projections in

the brochure, was as follows:

| Well Name | Estimated IP (min) | Estimated IP (max) | Actual W-2 IP | W-2 Test Date |
|---|---|---|---|---|
| Guy No. 4 (Well # 1) | 20 | 80 | 2 | 10/30/2010 |
| Guy No. 5 (Well # 2) | 20 | 80 | 42 | 10/16/2010 |
| Big Black Dog 1 (Well #3) | 20 | 80 | 10 | 11/21/2010 |
| Left Field No. 1 (Well #4) | 20 | 80 | 41 | 1/26/2011 |
| Left Field No. 2 (Well #5) | 20 | 80 | 15 | 1/30/2011 |
| Big Black Dog 3 (Well #6) | 50 | 400 | Not drilled | - |
| Big Black Dog 4 (Well #7) | 100 | 700 | Not drilled | - |

(App. 323; 298, 438-466 [W-2 Test forms]).  Moreover, as can be seen from the dates of the W-2

tests, Defendants knew their initial production estimates were wrong *while they were still selling

the program*.[24]  (App. 438-466; 470).  Thus, Defendants were telling investors what they

expected the wells to produce, when in fact, *they already knew* the wells were not coming in as

projected.[25]

Another significant misrepresentation Dr. Strickland identified related to Couch's

statement as to how he derived his estimated production for the second horizontal well, Well No.

7.  In the brochure, Defendants showed the estimated daily production for that well to be 100 to

700 bopd.  Couch testified that he had referred to the Cline Shale area as the source for this

projection.  (App. 324-326; 586 [Couch III-185-186]).  Dr. Strickland researched the Cline

Shale: he found only one well in the Cline Shale formation in the state, the Oxo 6612.  (App.

324-25).  Its initial production test was reported to the Railroad Commission was in July 2012,

---

[24]     Larry Hollar invested on March 25, 2011. (App. 148).  Jim Shover invested in April 2011. (App. 193).
Although he did not invest, William Miller received a 59 Well Program brochure, identical to Hollar's, with
the same inflated projections, in January 2012. (App. 221, 226, 239-249).

[25]     In addition, in looking at the location of the Big Black Dog No. 1 well, Strickland also noted the high
number of plugged and abandoned wells nearby, an indication of a depleted reservoir. (App. 326).

which means Couch could not have relied on that well as a basis for his estimate of Well No. 7 in

the 59 Well Program, which Defendants generated at least in 2010.  (App. 325).  Moreover, the

Cline Shale well's initial production was only 10 bopd, nowhere close to the 100 to 700 that

Couch projected in the brochure.  (*Id*. 325).  Cumulatively, the Cline Shale well has produced

708 barrels of oil, since it was drilled, and it has been shut in since late 2013. (*Id*.)  The fact that

Couch stated that he had relied for his estimates on a well that had not even been drilled at the

time clearly demonstrates that Couch had no reasonable basis for his initial production estimates

and was either intentionally misrepresenting projections to the investors, or was extremely

reckless in his projections.

### Misrepresentations specific to the R9 Program brochure.

Dr. Strickland also identified several misrepresentations that appeared only in the R9

Program brochure.  A significant one related to how much of the original oil and place ("OOIP")

would be drained through the use of the laterals Couch proposed to drill off the vertical well

bores in the program.  The plan for the R9 Well Program was to drill nine new vertical wells, and

then drill a large number of laterals off the main vertical well bores.  (App. 062-063).

Defendants' brochure described the benefits of laterals:

- "A vertical well drains at best 15% of the original oil in place (OOIP), before secondary completion work must be done to harvest more oil.  A horizontal well with one 1,200' long lateral will drain 50% of the OOIP.  4 x 300' laterals will drain up to 70% of the OOIP because the radials are closer to the well bore and allow for better oil migration." (App. 068).

- "Our plan is to drill at least 12 to 15 horizontal radials (4,800' to 6,500') at around $1.2 million and drain more than 80% of OOIP."  (*Id*.).

Defendants' statement that a vertical well drains at best 15% of the OOIP was correct.  (App.

316).  However, the rest of these statements were completely false.  Dr. Strickland explained in

his report:

> If a vertical well drains 15% of the OOIP, then a similar horizontal well in the same formation with one 1,200 lateral will also drain 15% of the OOIP, not 50%. A greater volume of oil may be produced from the well with the horizontal lateral because the wellbore contacts more of the formation, has a larger drainage area, and hence a greater OOIP in that well's drainage area, but the recovery factor will still be 15% of the OOIP.  The same is true of wells with multiple laterals. *A multi-lateral well may recover the oil faster than a vertical well but the volume of oil produced will still be 15% of the OOIP in the drainage area of each well.*

(*Id.*) (emphasis added).

Another factor demonstrates that falsity of Defendants' representations that laterals would increase the ultimate recovery of OOIP beyond 15%.  Defendants were drilling into what are known as "solution gas drive reservoirs."  (App. 317).   Dr. Strickland stated that reservoirs with a solution gas drive mechanisms have recovery factors from 2% to 25%, with typical values of 10% to 15%; recovery factors Defendants touted of 50% to 70% *cannot be achieved* in solution gas drive reservoirs.  (*Id.*).

> Statements in the brochures concerning high recovery factors are incorrect, misleading, and not in accordance with industry standards. *A reasonably prudent operator would not employ such values in either their literature or work processes.*

(App. 319) (emphasis added).

Thus, these statements in the R9 Well Program brochure as to the expectations of total recovery of OOIP were incorrect, misleading, and fraudulent. Telling investors that the laterals created by radial jet drilling will recover *more* of the original oil in place and will lead to a greater total recovery was false and misleading.

In addition to the projections about total recovery, Defendants knowingly made outrageous, and false, predictions as to how much oil they would recover in these programs— predictions and statements that no reasonably prudent operator would make but which were

calculated to lead investors to believe that this would be a profitable drilling program.  They

promulgated their inflated estimates even after they performed the W-2 initial tests and knew

the wells' production failed to meet their projections.  Based on his lengthy experience in the oil

industry, Couch knew that, or was extremely reckless in not knowing.  At a minimum, Dr.

Strickland's unrebutted opinions prove a reasonably prudent operator would never have made

these statements, thus making Couch was at a bare minimum negligent in making these

statements.

> **4.      Fourth misrepresentation/omission, on the R9 Well Program:  Defendants
> misrepresented their experience, expertise, and success with radial jet
> drilling.**

Defendants represented in the R9 Well Program brochure that they were experienced and

successful in using radial jet drilling technology. (App. 066-690).  These statements were

material because the radial jet drilling was represented as integral to the recovery of greater

quantities of oil from the reservoirs, and thereby leading to greater returns.  Couch's own

statements in testimony and in emailed updates to investors, however, show otherwise.

Dr. Strickland compared Defendants' descriptions of their radial jet drilling operations in

the brochures to a collection of statements Couch made in testimony about his radial jet drilling

operations and in the emailed updates to investors.  (App. 404-409 [Appendix N to Exhibit 11,

Dr. Strickland's Expert Report]).  Dr. Strickland concluded that Couch was engaged in an

ongoing research project with radial jet drilling and was trying to learn how to implement the

process.  (App. 327-329).  By the time he began offering the R9 Well Program, he had not

achieved success or mastered the technique.  (*Id*.)  Dr. Strickland's opinion is unrebutted.

Because Dr. Strickland's opinion is a comparison of Couch's own statements, Couch clearly

acted with *scienter* in misleading investors about his own experience with radial jet technology.

Two other misrepresentations about the radial jet drilling in the R9 Well Program brochure, which did not make it into Dr. Strickland's report, are noteworthy because Couch admitted in testimony they were not true.  Defendants stated in the brochure:

> Most of *our* laterals extend 300' to 500' from the original vertical oil well bore once we validate a good oil productive structure.

(App. 066)(emphasis added).  But Couch stated in his testimony that so far he had been unable to drill a 300-foot radial. (App. 560 [Couch I-141]).  In another example, Couch stated in the brochure that:

> One well with 4 – 300' radials costs around $1.0 million to drain 70% of OOIP, which can be completed in 4 to six days.

(App. 068).  In addition to the fact that Couch had been unable to drill one 300-foot radial, Couch testified that he had been unable to drill four in four to six days as he declared in the brochure. (App. 550-551 [Couch I-86-87]).  Couch also testified that he still did not know how much the radial jet drilling was going to ultimately cost, meaning his statement in the brochure that it cost $1 million was also false. (App. 551-553, 558-559 [Couch I-87-89, 115-116]).

Couch admits these two brochure statements were not true; because the statements were representations about Defendants' own past experience, that is also evidence of Defendants' *scienter*.  These statements were material to the R9 Program because they were details contributing to the overall picture Defendants were painting for investors, to lead investors to believe that the R9 Well Program would be successful through this special technology in recovering a higher percentage of oil.  In fact, Couch was struggling to figure out how to make it work.  The statements were false, and Couch knew it.

**5.      Fifth misrepresentation/omission, on the R9 Well Program:  Couch decided to terminate the R9 Well Program fund-raising early, but did not tell investors or modify the Offering Documents, and then misrepresented how he would raise the remainder of the money.**

The fifth category of misrepresentation or omission relates to Couch's decision to terminate the R9 Well Program fund-raising within days of his October 28, 2011 meeting with the Commission.  (*See* App. 557 [Couch I-97]).  He stated under oath that he decided to stop the R9 Well Program within days of that meeting.  (App. 572 [Couch III-74]).  He claimed he told the Brokers to "wind up" their activities at that time. (App. 572, 573 [Couch III-74, 77, 79]).  Couch further testified that no new investors were contacted, and that the only proceeds collected after the decision to wind up the program was made were from prospective investors who had already been in touch with the Brokers. (App. 573 [Couch III-77]).

However, that is not what happened.  As of the end of October 2011, Defendants had raised only $483,000 of the $7.5 million Defendants told investors was needed for a successful program.  (App. 470; 073).  Even though Couch knew he was going to terminate the fundraising, Couch's Brokers sold another $2.35 million in putative working interests to investors between October 28, 2011 and January 31, 2012.  Couch knew this was happening, as evidenced by the fact the $2.35 million was deposited into COG's operating account and Defendants paid the Brokers their commissions on those funds. (App. 474).  During this time, Couch failed to tell the investors that he had decided to not fund the program as described in the brochure.[26]

Compounding that material omission, Couch later, through his Brokers, falsely told investors he was shifting to seeking funds from institutional investors. (App. 574 [Couch III-87]; 659-660 [Porter 99-101]).  The Brokers sent out emails, to solicit any final investors, securing at

---

[26]      The details of exactly what Couch intended to do with the program at this point is unclear because he has provided multiple stories.

least one significant investor. (App. 221-222, 260).  But instead of raising funds from institutional investors, Couch stated he actually intended to borrow the additional drilling costs. (App. 575 [Couch III-98]).

Having determined to terminate the R9 Well Program, Couch did not disclose his intentions fully or truthfully.  He did not alter the R9 Well Program brochure to reflect his intentions. (App. 575 [Couch III-100]).  The same brochure was used in contacting new investors after October 28, 2011.  (App. 221, 260, 272-287).  Couch did not offer rescission to any of the existing R9 investors.  (App. 225). And he misrepresented that the balance of the funds would come from institutional investors, as opposed to debt.  These omissions and misrepresentations were material. Had existing and prospective investors known that Couch was terminating the fundraising, they would not have invested, or they would have demanded rescission.

Couch made all these misrepresentations knowingly. If Couch did not make the misrepresentations knowingly, he was severely reckless in his statements.

### 6.    Couch's *scienter* is imputed to COG.

COG was under Couch's control.  As a director, the CEO, and sole owner and officer of COG (App. 604 [Couch Depo. 61-63]), Couch made the false statements and carried out his scheme through COG.  *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the *scienter* of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n. 3 (2d Cir. 1972) (holding that *scienter* of agent who controlled two corporations could be imputed to those entities).  Couch made misrepresentations in connection with the offer, purchase, and sale of securities and acted with *scienter* or extreme recklessness. Because Couch's *scienter* is imputed to COG, each Defendant

violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder:

>    **7.      Alternatively, Defendants were negligent.**

Assuming the Court were to find that the issue of *scienter* or extreme recklessness was a disputed fact issue, the Commission is still entitled to summary judgment on its claims under Section 17(a)(2) and (3).

The unrebutted opinions of the Commission's expert prove that Defendants' misrepresentations and omissions as to production estimates and total possible recovery of oil, were, at the very least, negligent in that they failed to meet the standard of care of a reasonably prudent operator.   With respect to the other misrepresentations not addressed in the expert's report, the same is true:  If Couch was not acting intentionally, or with extreme recklessness, he was at least negligent.  Violations of Sections 17(a)(2) and (a)(3) of the Securities Act require, at most, a showing of negligence.[27]  *Aaron*, 446 U.S. at 697; *Meadows*, 119 F.3d at 1226  n. 15; s*ee also SEC v. Hopper,* 2006 WL 778640 at *9 (S.D. Tex. Mar. 24 2006).  While the Commission believes the evidence strongly supports a finding that the Defendants acted with *scienter*, there can be no doubt that they at least acted negligently.

**D.      Defendants' other affirmative defenses have no merit.**

The final ground of the Commission's motion is that it is entitled to summary judgment on Defendants' remaining affirmative defenses as a matter of law.

---

[27]      The Supreme Court has never addressed whether negligence is necessary to prove a violation of Sections 17(a)(2) and (a)(3). In fact, the Court has suggested that, at least under Section 17(a)(3), the focus is only on the "effect of particular conduct on members of the investing public, rather than upon the culpability of the person responsible" for the conduct.  *Aaron,* 446 U.S. at 696-97. The effect of Defendants' conduct on members of the investing public also justifies a finding that Defendants' violated, at a minimum, Sections 17(a)(2) and 17 (a)(3) of the Securities Act.

### 1.      The statute of limitations has not expired.

Defendants allege that the statute of limitations has expired on the Commission's claims.

Actions brought by or on behalf of the United States to vindicate a public right, as the

Commission is doing in this case, generally are not subject to statutes of limitations.  A five-year

statute of limitations exists with regard to seeking a civil fine, penalty, or forfeiture.  28 U.S.C. §

2462.  But in this case, Section 2462 is not relevant.  None of Defendants' conduct on which the

Commission sued is outside the five-year limitations period.  The Commission filed its

Complaint on May 12, 2014. (Dkt. 1).  The earliest misconduct alleged, the offering of the 59

Well Program, began in approximately mid-2010.

### 2.      Defendants' ratification and estoppel defenses are without merit as a matter of law.

Defendants allege the defenses of ratification and estoppel, but in response to

interrogatories requesting the factual basis for these defenses, Defendants provided none.  (App.

514, 516, 522).

Section 26 of the Exchange Act provides that the Commission cannot be considered to

have approved any action or failure to act:

> No action or failure to act by the Commission … , in the administration of this chapter shall be construed to mean that [it] has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein ….

15 U.S.C. § 78z.  Under Section 26, "the SEC cannot be held to have ratified illegal acts."  *SEC*

*v. Keating*, 1992 WL 207918, at *4 (C.D. Cal. July 23, 1992); *SEC v. Gulf & Western Indus.,*

*Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980) (Section 26 precluded defense that the Commission

had "ratified" accounting principles at issue).  As a matter of law, Defendants' ratification

defense is without merit.

As to the estoppel defense, "[I] is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Servs. Of Crawford County, Inc.,* 467 U.S. 51, 60 (1984).  Estoppel against the government is also disfavored because, "when the Government is unable to enforce the law because the conduct of its agents has given rise to estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* Thus, courts have held that the Commission may not waive the requirements of an act of Congress nor may the doctrine of estoppel be invoked against the Commission." *Keating*, 1992 WL 207918, at *3 (citing *SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir. 1959)); *see also SEC v. Morgan, Lewis, & Bockius*, 209 F. 2d 44, 49 (3d Cir. 1953); *SEC v. Badian*, 2010 WL 1028256, at *3 (S.D.N.Y. Mar. 11, 2010) (rejecting estoppel defense against SEC, citing *Culpepper*).  This position is further reinforced by Section 26 of the Exchange Act.  See also *Gulf & Western Indus., Inc.*, 502 F. Supp. at 348 (relying on Section 26 of Exchange Act in holding that estoppel was not a defense to an SEC enforcement action).  This affirmative defense is also meritless.[28]

As none of Defendants' affirmative defenses have any merit, they do not preclude summary judgment in the Commission's favor.

# V.
## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's motion for summary judgment and grant Plaintiff such other relief as it may be entitled.

---

[28]     None of Defendants' other affirmative defenses have any merit.  They are not defenses so much as challenges to the existence of evidence supporting the Commission's claims.

Dated:  August 24, 2015.                          Respectfully submitted,


                                                  /s/ Janie L. Frank
                                                  Janie L. Frank
                                                  Texas Bar No. 07363050
                                                  Timothy Evans
                                                  Texas Bar No. 24065211
                                                  SECURITIES AND EXCHANGE COMMISSION
                                                  Fort Worth Regional Office
                                                  Burnett Plaza, Suite 1900
                                                  801 Cherry Street, Unit #18
                                                  Fort Worth, TX 76102-6882
                                                  (817) 978-6478
                                                  (817) 978-4927 (facsimile)
                                                  frankj@sec.gov

                                                  COUNSEL FOR PLAINTIFF


### CERTIFICATE OF SERVICE

On August 24, 2015, I electronically submitted the foregoing document to the Clerk of the Court of the U.S. District Court, Northern District of Texas, Dallas Division, using the CM/ECF system.  The electronic case filing system will send a "Notice of Electronic Filing" to all counsel of record who has consented in writing to accept service of this document by electronic means.

                                                  s/ Janie L. Frank
                                                  Janie L. Frank