**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § § | |
| **Plaintiff,** | § | **CIVIL ACTION NO.** |
| **v.** | § | **3:14-cv-01747-D** |
| | § | |
| **CHARLES COUCH and COUCH OIL & GAS, INC.,** | § § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

SCHEEF & STONE, LLP

By:     */s/ J. Mitchell Little*
        J. Mitchell Little
        Texas State Bar No. 24043788
        2601 Network Blvd., Ste. 102
        Frisco, Texas 75034
        (214) 472-2100 – Telephone
        (214) 472-2150 – Facsimile
        mitch.little@solidcounsel.com

        **ATTORNEYS FOR DEFENDANTS**
        **CHARLES COUCH AND**
        **COUCH OIL & GAS, INC.**

# TABLE OF CONTENTS

I.   SUMMARY ................................................................................................................... 1

II.  LEGAL STANDARD ................................................................................................... 2

III. ARGUMENT ................................................................................................................. 2

A.   The Commission Has Not Carried its Burden that the Interests are Securities. ................ 2

B.   The Commission Has Not Carried its Burden that Defendants Violated Section 5 of the
     Securities Act ................................................................................................................. 7

C.   The Commission Has Not Carried its Burden that Defendants violated Sections 17(a),
     10(b) or Rule 10b-5 ...................................................................................................... 11

IV.  CONCLUSION ............................................................................................................. 22

## TABLE OF AUTHORITIES

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46 (1st Cir. 2008) .............................................. 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............. 2

*Barnett v. E. Side Jersey Dairy, Inc.*, No. 1:10CV6-SA-DAS, 2011 WL 6151418, at *1 (N.D. Miss. Dec. 12, 2011) ............................................................................................................ 10

*Barnett v. E. Side Jersey Dairy, Inc.*, No. 1:10CV6-SA-DAS, 2012 WL 1376998 (N.D. Miss. Apr. 19, 2012) ................................................................................................................... 10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ......................... 2

*Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ........................................................................ 8

*Greenberg, et al., v. Crossroads Sys., Inc., et al.,* 364 F.3d 657 (5th Cir. 2004) ........................ 16

*In re Anadarko Petroleum Corp. Class Action Litigation*, 957 F.Supp.2d 806 (S.D.Tex. 2013). 16

*In re Donald Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357 (3rd Cir.1993), cert. denied, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) ................................................... 15

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ................................................... 10

*Magruder v. Halliburton Co.*, 2009 WL 854656 (N.D.Tex., March 31, 2009)..................... 16, 17

*Omnicare, Inc., et al v. Laborers Dist. Council Constr. Ind. Pension Fund, et al.*, 575 U.S. ____, 2015 WL 1291916 (Mar. 24, 2015) ........................................................................ 17, 18, 19

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ............................................................................................................................... 10

*Rosenzweig v. Azurix Corp.,* 332 F.3d 854 (5th Cir. 2003) ................................................... 16, 17

*Rubinstein v. Collins,* 20 F.3d 160 (5th Cir. 1994) ................................................................ 16, 17

*SEC v. Alliance Leasing Corp.*, 2000 WL 35612001 at *10 (S.D. Cal. 2000) ............................ 13

*SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137 (5th Cir. 1972)................................................. 8

*SEC v. Gann*, 565 F.3d 932 (5th Cir. 2009).............................................................................. 12

*SEC v. Murphy*, 626 F.2d 633 (9th Cir.1980)........................................................................... 12

3

*SEC v. Ralston Purina, Co.*, 346 U.S. 119 (1953) ........................................................ 9

*SEC v. Spence & Green Chem. Co.*, 612 F.2d 896 (5th Cir. 1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981) .................................................................. 12

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ............................................................ 5

*United Housing Found. Inc. v. Forman*, 421 U.S. 837, 851-52 (1975) ......................................... 5

*United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ...................... 2

*Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 535 (N.D. Tex. 2005) ...................................... 8

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir.), cert. denied, 454 U.S. 897 (1981) ........................ 5

*Youmans v. Simon*, 791 F.2d 341 (5th Cir. 1986) ........................................................ 5

**RULES**

FED. R. CIV. P. 56(c) ...................................................................................... 2

FED. R. CIV. P. 9(b) ...................................................................................... 15

FEDERAL STATUTES

15 U.S.C. § 77q(a) ........................................................................................ 2

Defendants Charles Couch and Couch Oil & Gas, Inc. ("Defendants") file their Response to the Securities and Exchange Commission's (the "Commission's") Motion for Summary Judgment, and in support, respectfully show the Court as follows:

## I.    SUMMARY

The Commission, despite all of its investigative efforts and having constructed its Complaint around private placement memoranda ("PPMs"), now readily admits that it cannot identify a single investor who received the PPMs and hastily retreats from that theory of the case.[1]  Instead, the Commission now reimagines its case around the color brochures provided to investors and those brochures' silence as to the use of investor proceeds and other matters. Importantly, if the Court finds a genuine issue of material fact regarding the existence of a general partnership- a joint venture, the entire Motion for Summary Judgment fails, since all of the Commission's causes of action hinge on the existence of a security and are defeated by the existence of a joint venture.

 Further, many of the Commission's "undisputed facts," are hotly contested: That the investors were not participating in a general partnership; that Couch knew his estimates were incorrect and continued to offer them anyway; that the wells were not in "proven, undeveloped" productive oil zones; that Defendants employed sales agents; that Defendants denied investors access to financial information; and that Couch misused investment proceeds.

The evidentiary record paints a picture of two failed oil and gas partnerships in which the investors took a known risk and that did not meet projections.  What the record does not demonstrate is an effort by the Defendants to mislead or violate the securities laws.  The Commission does not carry its burden on summary judgment, and the Court should deny the

---

[1] The Court will note that this fact formed the basis, in large part, for Defendant's Motion to Dismiss.  The Court drew an inference from the Complaint in favor of the Commission, which the Commission now admits was not true. *See* Memorandum Opinion and Order, December 31, 2014.

Commission's Motion.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is only appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex* 477 U.S. at 32225, 106 S.Ct. at 2551-2554.  Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. Id. at 321–25; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson*, 477 U.S. at 248. All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

## III.   <u>ARGUMENT</u>

The Commission has not demonstrated entitlement to a judgment as a matter of law because many genuine issues of material fact exist.

**A.**   **The Commission Has Not Carried its Burden that the Interests are Securities.**

Couch's investors participated in joint ventures (read: general partnerships) that are not securities.  If the Court finds that there is a genuine issue of material fact on the question of

whether the interests in this case are securities, then the Court must deny the Commission's Motion for Summary Judgment in its entirety because he existence of a security is, of course, the cornerstone of every cause of action brought by the Commission in this case. Here, a reasonable jury could find the existence of true joint ventures in this case rather than securities.

The Commission now claims for its benefit the fact that individual investors did not receive record title to the interests that they acquired in both the 59-Well and 9-Well Programs. In reality, the individual investors were never supposed to receive record title, which was always intended to be held by Couch Oil & Gas at the partnership level.  Both private placement memoranda on which the Commission's case was built demonstrate that "Title to the Venture's interest in the Well will be held in the name of the Venture Manager or Couch Oil & Gas, Inc., except that title to such property may be held temporarily in the name of nominees in order to facilitate the acquisition of such property by the Venture and for other valid purposes." COUCH_APP-84, 135.  If properly filed with the IRS, each investor identified himself or herself to the federal government as a general partner with Couch Oil & Gas, being entitled to a specific share of the profits and losses of the partnership, having a capital account, and receiving income. COUCH_APP-39, 43, 47, 51, 54, 56.  In other words, no investor can deny the existence of these general partnerships or claim a right to an assignment of working interest in a specific well. Accordingly, this evidence demonstrates the structure of the 59-Well and R9 programs as joint ventures.

Further evidence also demonstrates that the substance of these programs (as opposed to the form) was in the nature of a joint venture.  Specifically, each individual investor had to have his or her money at risk in order to take the tax deductions related to the tangible and intangible drilling costs associated with the 59-Well and 9-Well programs.  Each investor (including those

offered as declarants in the Commission's Motion) received an IRS Form K-1—the type of from associated with a partnership return—and took the requisite tax deductions associated with a fully at-risk investment. COUCH_APP-38-57,  Both the partnership return and the individual Forms K-1 sent to investors and, conceivably, filed with the Internal Revenue Service, factually demonstrate  the existence of a complete general partnership..   SEC_APP-00164.   The Participation and Subscription Agreement itself for the 59-Well Program provides, "Participants will be recognized to participate as limited liability partners and will be reported in the 2010 year IRS 1065- K1 form." SEC_APP-00001.  The agreement refers to an "Industry Joint Venture" throughout.   SEC_APP-00003-00004 (para. 4(j)-(k)).   The Participation and Subscription Agreement for the 59-Well Program, in fact, appoints Couch Oil & Gas, Inc. as attorney-in-fact for the purposes of executing lease assignments.  SEC_APP-0005 (para. 8).  Nowhere in the Agreement does the subject of title to the working interest itself arise, so certainly no investor could have relied on any such statement to his detriment.

The same Power of Attorney and references to an Industry Joint Venture appear in the Participation and Subscription Agreement for the R9 Program.  SEC_APP-00075-00084 (para. 4(j)-(k), 8).  The brochure for the R9 Program is similarly silent on the subject of title to the working interest itself.  The Participation and Subscription Agreements, as well as the color brochures, are silent on the subject of title, but they certainly speak to the existence of a joint venture and partnership reporting.  The Commission argues that the reference to a strategy of "shared ownership in multiple wells" militates for the existence of a sale of a working interest only, but the same verbiage might also be applied to a partnership context.  The same sentence refers to subscribers as "partners," and the economic reality of the program is that title was held by the managing partner (Couch Oil & Gas, Inc.) at a partnership level.  The Commission further

argues that Couch "admits" that the investors purchased a working interest; Couch's understanding of the program and its legal effect notwithstanding, the company filed a partnership return, as did each of the investors file their Forms K-1 as partners.

The Court has to look beyond the face of the agreements and beyond Couch's testimony to the substance of the situation and determine whether a reasonable jury could conclude the existence of a partnership between Couch Oil & Gas, Inc. and the participants in the 59-Well and R9 programs. This Court must apply the *Howey*[2] test and the "economic realities test" in light of the "substance and economic realities of the transaction—rather than the names that may have been employed." *United Housing Found. Inc. v. Forman*, 421 U.S. 837, 851-52 (1975); accord, *Williamson v. Tucker*, 645 F.2d 404 (5th Cir.), *cert. denied*, 454 U.S. 897 (1981). Consequently, "a scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labelling itself a general partnership or joint venture." *Id*, 645 F.2d at 423. The inverse is true as well. While the Commission offers evidence that the 59-Well and R9 programs were investments of money in a common enterprise, the no evidence demonstrates that the investors were led to expect profits derived from the efforts of others.

General partnership interests are not securities under the Securities Act or the Exchange Act, and joint ventures are subject to the same analysis of general partnerships. *See Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir. 1986) n.2. There is a strong presumption that a general partnership interest is not a security. *Id*. at 346. The SEC bears a heavy burden of proof in this regard. A joint venture interest may be a security if "in spite of the partnership form which the investment took, [the investor] was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers." *Id*. at 424. No evidence suggests

[2] *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

any investor even tried to exercise any such powers, much less that any investor actually tried and failed.  Further, the SEC presented no evidence that the Couch joint venturers were so inexperienced and unknowledgeable in business affairs that they were incapable of intelligently exercising the partnership powers.  On the contrary, the subscribers affirmatively represented and warranted in writing that they (1) were accredited and (2) possessed knowledge and experience in financial and business matters and am capable of evaluating the merits and risks of an investment in the Program, and am able to bear the economic risks of my purchase…" SEC_APP00004 (para. 4(o)).  The Declarants in support of the Commission's Motion for Summary Judgment all made the same representations and warranties.  COUCH_APP-5, 13, 28. Similarly, the Commission presents no evidence that Couch's ability was somehow unique or that Couch was not subject to replacement as the manager of this partnership; in fact, no one ever attempted to remove Couch as the manager of the partnership.

The reasonable inference arising from evidence regarding these two offerings, an inference which a reasonable jury could base its finding on, is that t the parties intended (and then actually reported to the Internal Revenue Service) the legal format of general partnerships or joint ventures.  Indeed, as the movant, the Commission must prove no genuine issues of material fact exist regarding whether these relationships at issue here were joint ventures- an element of the Commission's claim, not an affirmative defense - a burden the Commission cannot carry, given  the Court's obligation to view all evidence and inferences in Couch's favor.   . Consequently, the Commission's Motion for Summary Judgment must be denied. Denial of summary judgment on the question of the existence of a security, also moots the Commission's motion on the question of a Section 5 violation, since that claim also requires the *existence* of a security and the *absence* of a joint venture.

**B.      The Commission Has Not Carried its Burden that Defendants Violated Section 5 of the Securities Act**

The Commission's claim is predicated purely on the behavior of individuals the Commission claims acted as Couch's sales agents with regard to the 59-Well and R9 programs. The argument ignores evidence with which the Commission is familiar however, that both Kirk Porter and Greg Tuthill provided testimony controverting the Commission's argument. Porter testified that he never projected any investment returns for any investor with whom he communicated other than what was in the "prospectus." COUCH_APP-153-154. Tuthill testified that Charles Couch never instructed him to sell oil and gas investments on behalf of anyone and that he did not sell oil and gas investments on behalf of anyone. COUCH_APP-184. Tuthill testified that he does not have any evidence that he sent a private placement memorandum to anyone. COUCH_APP-185. Tuthill did not refer unaccredited investors to Couch for investment and did not talk to any investors about potential returns. COUCH_APP-186. Tuthill did not have the ultimate ability to say "yes" or "no" as to whether a subscription would be accepted. COUCH_APP-187. Charles Couch and Kirk Porter instructed Tuthill not to make any promises about any potential outcomes or potential returns. COUCH_APP-190-191.

The Commission identifies the exemption at issue in this case: A transaction not involving any public offering. Private placements can have an unlimited number of accredited investors and still remain exempt, and each and every investor in these two programs represented that they were both accredited and able to bear the economic risks of the investments. The Commission offers the Court no competent summary judgment evidence of the number of offerees in the 59-Well and R9 programs; the Commission simply offers the bare assertion that the number of offerees "substantially exceeded the number of ultimate investors." Motion at p. 25. Each of the investors (including the Commission's affiants) represented and warranted in

writing that they were <u>accredited and sophisticated</u> and that they made the investment <u>based on direct, personal contact with the issuer</u>.  The Commission informs the Court that the offerings were sold to a "large" number of investors, but compared to what, and compared to what number of actual offerees?

And, the Commission's argument regarding the four *Continental Tobacco*[3] factors which control whether an offering is public or private—the number of offerees, their sophistication, the size and manner of the offering, and the relationship to the issuer—fails to demonstrate the absence of any genuine issue of material fact.  The Commission offers no evidence of the number of offerees or their sophistication, and the only evidence regarding the relationship of the offerees to the issuer are the affidavits of five investors, each of whom represented and warranted in writing  that they made their investments through direct, personal contact with the issuer.  The Commission's evidence which attempts to demonstrate the absence of an exemption is far too sparse to carry the heavy summary judgment burden it bears. Likewise, the Commission's record citations supporting its contention that a general solicitation occurred are equally sparse.  The hearsay statement of Larry Hollar regarding an advertisement is not evidence[4] and, should not be considered for the additional reason that the statement was never produced in discovery.  Likewise, affidavits in which investors state generally, they *found or learned of* the existence of Couch Oil & Gas on the internet, is not evidence of actual *offering* made over the internet.  SEC_APP. 144, 189, 192, 206, 220-221).   Indeed, the SEC offers no evidence of a general solicitation made over the internet—only a contention that Couch Oil & Gas had a "web presence" and investors discovered it while researching oil and gas investing online.  And the

---

[3] *SEC v. Cont'l Tobacco Co. of S.C.,* 463 F.2d 137 (5th Cir. 1972).
[4] Hearsay is not competent summary judgment evidence.  *See Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995); *Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 535 (N.D. Tex. 2005).

Commission's argument that "These were not small offerings," demonstrates the weakness of its evidence.  No rubric governs which offerings are "small" or "large."  Private placements range from 2-3 friends and family members to thousands of investors pooling money in unregistered hedge funds—all operating under the same exemption from registration and involving accredited investors.  Indeed, the case cited by the Commission—*SEC v. Ralston Purina Co.*—holds that "there is no warrant for superimposing a quantity limit on private offerings as a matter of statutory interpretation."  *Id.* at 346 U.S. 119, 125 (1953).  Because the law defeats its argument, the Commission offers no authority for the contention that the size of the offerings here destroys any exemption.

The Commission also condemns Couch for not providing offerees with financial statements, balance sheets, or similar information that would be included in a registration statement, but the Commission offers no legal support for the contention that such information is, in fact, required.  *Ralston Purina* simply states, "The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions . . . An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'"  *Id.* at 124-125.  In *Ralston Purina*, a manufacturer of feed and cereal products sold treasury stock to employees from "chow loading foreman" to "stock clerk" all over the country with <u>zero</u> disclosure.  *Id.* at 121.  In the instant case, the investors received a business synopsis with a description of the business of the offering and risks (like a registration statement) and subscription agreement with risk disclosures and  each subscriber was required to self- identify as accredited or non-accredited.  All accredited subscribers were accepted.  Under these circumstances, the Commission does not identify any authorities – because none exist that required Couch to provide either financial statements or balance sheets to claim a valid

exemption from registration.

Nonetheless, the Commission argues the Rule 506(b) exemption is unavailable to the Defendants because "the Defendant sold securities to unsophisticated non-accredited investors." The Commission offers the Affidavits of investors Felix Schwartz and Jim Shover on this point (SEC_App. 190, 222), but, if this is true, the subscription agreements demonstrate that both subscribers **lied in writing** with regard to their accreditation status *in order that* they might participate. COUCH_APP-11, 26.  Schwartz and Shover's lies notwithstanding, as far as Couch knew, both subscribers <u>were</u> accredited and would satisfy the exemption based on their subscription agreements.  Such contradictory evidence on this important point requires the Court to find a genuine issue of material fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ("We resolve factual controversies in favor of the nonmoving party…"); *Barnett v. E. Side Jersey Dairy, Inc.*, No. 1:10CV6-SA-DAS, 2011 WL 6151418, at *1 (N.D. Miss. Dec. 12, 2011) <u>adhered to on denial of reconsideration,</u> No. 1:10CV6-SA-DAS, 2012 WL 1376998 (N.D. Miss. Apr. 19, 2012)("When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence"), *quoting Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

With regard to Ms. McCreary's Affidavit, the Commission intimates there are more than 35 unaccredited subscribers—or at least that Couch will be unable to prove that there were fewer than 35 unaccredited subscribers- an irrelevant contention since the Commission bears the burden of proof on this point, but offers no evidence that there were more than three unaccredited subscribers in the 59-well program. In fact, no evidence has been submitted from which the Court could determine the applicability of this this exemption.  Instead, the evidence demonstrates 89 subscribers who claimed to be accredited, which is the bulk of the offering

itself.   Because the Commission fails to demonstrate the absence of a genuine issue on the existence of a public offering, its Motion must be denied.

**C.     The Commission Has Not Carried its Burden In Demonstrating that Defendants violated Sections 17(a), 10(b) or Rule 10b-5**

Mere silence or the absence of a representation in the offering documents alone does not support the Commission's claim.   Yet, the Commission provides the Court with neither an actual false statement nor a statement rendered false by omission.

**1.   Nature of the Interests**

The Commission contends that the mechanism of transfer of the interests in the oil wells in question was either a misrepresentation or an omission, without saying which.   Couch's retention of title to the investments is undisputed, since Couch Oil & Gas, Inc. was the manager of the joint venture.   Yet, the Commission points to no writing—whether the offering documents or the subscription agreements—that makes a false or misleading statement regarding transfer of working interest ownership by way of assignment.   Importantly, a simple omission creates no violation under Section 17(a), 10(b) or Rule 10b-5.   Instead, the Commission must identify either (1) a misrepresentation of material fact or (2) an omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. 15 U.S.C. §77q(a)(2).   Nowhere in any of the offering documents does Couch promise title transfer by way of direct assignment.   In fact, Couch's prior partnership always functioned this way for the simple reasons that joint interest billings from the operator are expected to be paid by the industry partner (Couch), and revenue is expected to be distributed to one industry partner (Couch), not all of Couch's subscribers. Couch always recognized the subscribers' participation and ownership and accounted for the program in this way through the

distribution of revenue and expenses. When the evidence is viewed through the lens of the partnership demonstrated by the evidence discussed above, holding title in the name of the venture manager (here, Couch Oil & Gas, Inc.) holding a power of attorney makes perfect sense.

### 2.  Use of Proceeds

As an alternative misstatement, the Commission argues that the offering documents provide that "all of the money raised from investors would be applied towards paying the turnkey costs of drilling the wells."   The argument ignores the evidence, which rebuts this argument.   The investments were not charitable endeavors on Couch's part, nor would any investor expected as much.   As the two programs floundered, Couch basically bankrupted himself trying to make the programs work, adding additional wells and performing additional work.

Although the Commission is correct that the offering documents do not disclose the payments to XO marketing, no statement in the offering documents or the subscription agreements is rendered misleading by the omission of these payments. The *sine qua non* of a securities violation under Section 10b-5 of the Exchange Act is a material misstatement or omission in connection with the purchase or sale of securities, made by Defendants, with scienter.  *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). The SEC must establish these same elements in order to establish a violation of Section 17(a) of the Securities Act.  *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d. 806 (1981).  Most importantly, some **other** statement in the offering documents must have been rendered misleading by the omission of the payments to XO Marketing in connection with the offering; there exists no such statement here.  In fact, the offering documents are extremely undetailed when it comes to use of the investment proceeds.  There is virtually no

description of the various expenses, vendors, third parties, equipment costs overhead, or any other detail with regard to the drilling of the subject wells, but the investors invested anyway on the basis of a turnkey—literally, that Defendants would deliver the wells for a fixed cost regardless of the actual cost.  Couch ended up spending every dollar he received from the offering and then some in an effort to help the programs reach profitability.

The Commission cites a 2000 California summary judgment case in support of its contention that the payments to XO Marketing were material on their face because they go to "an investor's assessment of the strength of a potential investment." *SEC v. Alliance Leasing Corp.*, 2000 WL 35612001 at *10 (S.D. Cal. 2000).  But that inference—the expectation that the strength of an oil and gas investment hinges upon the payment or non-payment of monies to third parties—is unreasonable.  Every investor dollar is *always* at risk in an oil and gas investment.  If 100% of the investment subscriptions had been invested in the drilling of the oil and gas wells at issue in the instant case, the outcome would have been exactly the same: a poorly-performing oil and gas investment due to an inability to extract it from the ground. The program did not fail for lack of money or misapplication of fiduciary property by Couch; the program failed because Couch did not produce enough oil and gas—the only metric by which one can evaluate the strength or potential success of an oil and gas investment.

The *Alliance Leasing* court supported its finding by citing *SEC v. Murphy*, stating, "The Ninth Circuit has held that the 'materiality of information relating to **financial condition, solvency, and profitability** is not subject to serious challenge.'" *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir.1980).  Because the Defendants themselves were performing the actual work involved in each offering, however, the payments to XO Marketing affected neither the financial condition, solvency, or profitability of either the R9 or 59-Well Programs.

The Commission also claims that using investor funds by employing one general operating account and paying expenses therefrom as Couch did was, in itself, a violation because it was "inconsistent with how Defendants' brochures promised investors their money would be spent." The contention, not the description of use, is false. Footnote 20 of the Motion explains why the Commission's cannot carry its burden on this issue: "difficult to identify in more detail precisely how Couch spent the investor funds because his accounting records are incomplete." With the exception that Couch would drill the wells, the offering documents themselves are silent with regard to how investor money would be spent. The subscribers, provided with the offering documents and those documents' silence on this issue, subscribed anyway.

### 3.   Oil Production

The Commission offers no individual material misstatements regarding the potential production of oil or gas, but instead seeks to convince the Court that "the cumulative effect" of the projections was to present the programs as "low-risk, high-return" investments. Motion at p. 36. This assertion is particularly outrageous given (1) the risk disclosures contained in each subscription agreement, (2) the cautionary statements contained in each brochure, and (3) the current state of the law regarding forward-looking statements. As expressed by Defendants in their Motion to Dismiss, the allegations related to the projections of production from the wells within the 59-Well Program and the Radial Nine Well Program are emblematic of a disturbing trend in enforcement toward policing an issuer's ability to discern the future rather than an issuer's "statements of fact." The Commission offers the testimony of its expert witness, Dr. Strickland, in support of the contention that the projections were "not made in accordance with industry standards and were not statements that a reasonably prudent operator would have made." Federal law bars this theory of the case.

This pillar of the Commission's case (estimates and projections) is addressed repeatedly by written disclosures and warnings of which the Commission is aware. The Court should apply the "bespeaks caution doctrine" to the Commission's claims arising from any reserve estimates and revenue projections. The bespeaks caution doctrine applies here, since where "forecasts, opinions, or projections are accompanied by meaningful cautionary statements, the forward looking statements will not form the basis for a securities fraud claim if those statements did not affect the total mix of information" provided to investors. *In re Donald Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3rd Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). The doctrine covers "situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions— affecting the reasonableness of the reliance on and the materiality of those projections." *Rubenstein v. Collins*, 20 F.3d 160, 167 (5th Cir.1994). In the instant case, the projections are accompanied in the brochures by statements such as, "**Projections are not a guarantee of actual rate of return," (SEC_APP-00071). The R9 Subscription Agreement states in all capital letters:

> THIS INVESTMENT IS SPECULATIVE AND SUBJECT TO SUBSTANTIAL RISKS. IT SHOULD BE CONSIDERED BY, AND IS SUITABLE ONLY FOR, THOSE PERSONS WHO CAN AFFORD TO ASSUME THOSE RISKS AND WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT. SEC_APP-00075.

The Subscription Agreement continues on to require that investors recognize the high degree of risk and that there are economic risks associated with the nature of multiple oil wells. SEC_APP-00079 (para. 4(f)-(g)). Finally, and most importantly, the subscribers were required to specifically represent and warrant the following:

> I understand that the projections of potential production results and the reserve estimates included in the exhibits thereto are merely estimates of possible results and not predictions of actual results, understand that such projections have been based on a very favorable level of production for a specified period of time, which

> sustained level of production I understand cannot be assured by the Company, and accordingly, I have not relied on such projections as a representation, warranty or promise of future results of an investment in this Program. SEC_APP-00080.

This type of representation and warranty is the quintessence of the bespeaks caution doctrine, and the same types of cautionary statements appear in the 59-Well program. SEC_APP-00003-00004. Each of the investors who prepared Declarations in support of the Commission's Motion made these same representations and warranties. COUCH_APP-5, 13, 28. These representations and warranties defeat the subscribers' claims of projection fraud.

These projection fraud claims present the classic "fraud by hindsight" case where "there is nothing in the … complaint to establish that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable, if they were unreasonable." *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 62 (1st Cir. 2008). "[F]raud-by-hindsight [, however] is not a valid theory under Rule 10b." *In re Anadarko Petroleum Corp. Class Action Litigation,* 957 F.Supp.2d 806, 821, n. 5 (S.D.Tex. 2013). Statements of belief of a company's future prospects are only objectionable *when the evidence shows that the speaker did not hold the belief and asserted something false or misleading. Greenberg, et al., v. Crossroads Sys., Inc., et al.,* 364 F.3d 657, 670 (5th Cir. 2004)(emphasis added). Such predictive statements may be actionable where "(1) the speaker does not genuinely believe the statement is accurate; or (2) there is no reasonable basis for that belief; or (3) the speaker is aware of undisclosed facts that would tend to seriously undermine the accuracy of the statement." *Magruder v. Halliburton Co.,* 2009 WL 854656 (N.D.Tex., March 31, 2009) at *5, citing *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 868 (5th Cir. 2003); *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir. 1994). However, a mere allegation that certain predictive statements had no reasonable basis "would hardly suffice to state a claim under Rule 10b–5." *Magruder* at *5,

citing *Rosenzweig,* 332 F.3d at 870 (emphasis added).

In March of 2015, the Supreme Court more carefully and clearly defined the circumstances under which a forward-looking statement may be actionable under the Securities Act.  In *Omnicare, Inc., et al v. Laborers Dist. Council Constr. Ind. Pension Fund, et al.*,  U.S. ____, 135 S.Ct., 1318, 2015 WL 1291916 (Mar. 24, 2015), the Supreme Court established both the pleading standard and the liability standard for statements of opinion under the Securities Act.   At the trial court level, *Omnicare* obtained dismissal of Securities Act antifraud claims related to certain "We believe" statements of opinion in its registration statement.  The Sixth Circuit reversed and revived the misrepresentation claim.  The United States Supreme Court vacated that decision and again destroyed the misrepresentation claims related to statements of opinion.  Justice Kagan, writing for the Court, stated that the misrepresentation cause of action contained within Section 11 of the Securities Act "does not allow investors to second-guess inherently subjective and uncertain assessments.  In other words, the provision is not, as the Court of Appeals and the Funds would have it, an invitation to Monday morning quarterback an issuer's opinions."  *Omnicare,* 2015 WL 1291916 * at 7. By offering the expert opinion of Dr. Strickland as evidence no one should have made the projections Couch Oil & Gas made, the Commission engages in the prohibited Monday-morning quarterbacking.

The Supreme Court then conducted a separate omissions analysis in *Omnicare*, holding, "A reasonable person understands, and takes into account the difference we have discussed above between and statement of fact and a statement of opinion. [...] In other words a statement of opinion is not misleading just because external facts show the opinion to be incorrect. ***Reasonable investors do not understand such statements as guarantees***, and §11's omissions

clause therefore does not treat them that way."[5] [emphasis added] *Id*. at 8.    Kagan's objective "reasonable investor" rubric cuts the Commission's claims to the bone, almost as if it were written for this very case:

- "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.  Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."  *Id*. at 8.

- "A reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement."  *Id*. at 8.

- "... an investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Id.* at 9.

- "The reasonable investor understands a statement of opinion in its full context, and §11 creates liability only for the omission of material facts that cannot be squared with such a fair reading."  *Id*. at 9.

- "As we have explained, an investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion.  And to do so, the investor cannot just say that the issuer failed to reveal its basis."  *Id.* at 10.

- "To be specific: The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or

---

[5] It is worth noting that the private omission cause of action created by Section 11 of the Securities Act is essentially identical to the 17(a), 10(b), and 10(b)-5 claims brought by the Commission.

the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. ***That is no small task for an investor***." [emphasis added] *Id.* at 10.

The Commission fails both the pleading standard and the objective "reasonable investor" liability standard under *Omnicare*. First, instead of pleading the omission of any specific facts, the Commission instead offers testimony of an expert witness that the predictions were simply wrong and should not have been made.

Indeed, Dr. Strickland's opinion ignores the fundamental fact that no reasonable investor could have read the reserve estimates or revenue projections in concert with the disclaimers, warnings, and risk disclosures and still state a claim on the basis that those opinions were wrong. Dr. Strickland states that Couch's extensive oil industry experience is itself suggestive of an omission in each program. However, the Commission offers the Court no undisputed facts regarding which Couch was aware that it did not disclose in connection with its projections, nor does the Commission identify any specific inquiry that Couch failed to conduct. From one side of his mouth, Dr. Strickland states that no reasonable person could have made the projections listed in the brochures, yet from the other side he identifies two program wells from the 59-well program (the Guy No. 5 and the Left Field No. 1) that had initial production well inside the range projected in the brochure at 42 and 41 barrels of oil per day, respectively. SEC_APP-438-466; 470. In short, the Commission's allegations on this point are a mile wide, and its proof is an inch deep.

Because genuine issues of material fact still remain in this case, the Motion for Summary Judgment must be denied on this point.

### 4. Radial Jet Allegations

Couch was experienced and successful in deploying radial jet drilling technology. Dr. Strickland's opinion that Couch was engaged in an "ongoing research project" with radial jet drilling attempts to somehow diminish the fact that all of oil and gas exploration is an "ongoing research project."  What Dr. Strickland's opinion does not offer is any facts of which Couch was aware with regard to radial jet drilling that he had failed to disclose in communications and that render other statements he made misleading.  Couch had implemented the procedure on other oil and gas programs, and achieving "success" or "mastering the technique" is all subjective based on the amount of success enjoyed by the program itself.

While it is clear that Couch was proving up the technology in the Andrews Field, Couch did not make any statements to investors that the technology was somehow perfect or even completely predictable.  Such a contention would fly in the face of the subscription agreements that trumpeted risk to the subscribers over and over again.  In the Appendix N to Dr. Strickland's own expert report, he cites the Court to the involvement of "Total, Occidental, Eni, [and] the country of Oman" in the radial jet seminar that he hosted.  Rad Jet and Power Hydraulics were involved as well. COUCH_APP-160.   In other words, Couch was drawing on the majority of the experts in the field of radial jet drilling to apply the technology to the R9 program in an effort to make it as successful as possible.  Couch testified under oath that he was "fine tuning" the technology,, but  taking that testimony out of context and extrapolating it into Couch not having any expertise and just engaging in a "research project" is completely untrue, and improperly misconstrues the evidence the Court must view in Defendants' favor.

Couch interacted with Dr. Buchman (the progenitor of the technology) regarding the implementation of it and even engaged Dr. Buchman as a vendor on the R9 wells. COUCH_APP-160.  Moreover, contrary to the SEC's interpretation, the statements contained in

the brochure were not intended to be representative of Couch's past radial jet experience, but were forward-looking in nature. Couch took a successful, mainstream technology and applied it to the subject wells in this case in an effort to improve production. Simply showing that Couch was unable to drill a 300-foot lateral leg with radial jet technology on the R9 program, a future occurrence not relevant to whether a statements regarding prior experience were true and the time they were made, is not enough to demonstrate *fraud*. Instead, the Commission must demonstrate that Couch either (1) knew in advance that he was not capable of drilling a 300-foot lateral or (2) that he had no reasonable basis for believing that he could drill a 300-foot lateral. The Commission demonstrated neither. In point of fact, Couch had every reason to believe that he could and would successfully deploy radial jet drilling technology on the R9 and 59-Well programs. In fact, Strickland's own report demonstrates that Couch applied the technology successfully in at least three wells—all in the Left Field. COUCH_APP-166. The Commission failed to carry its burden of proof on this point, and the Commission's Motion should be denied.

### 5. "Wind Down" Allegations

Couch's testimony has been consistent that he instructed anyone having anything to do with XO Marketing to cease contact with investors upon making contact with and providing information to the Commission. In an attempt to clearly comply with the securities laws, Couch attempted to raise the remaining money in the open offering from institutional investors. When those efforts were unsuccessful, Couch attempted to borrow the money. Lack of unsuccessful in that endeavor left Couch with no way to complete the program and simultaneously satisfy the Commission's concerns about the R9 program. Couch had no way of knowing events would unfold in this manner, prior to the initiation of the offering, nor could he have predicted his lack of success at raising equity from institutional investors or debt from banks. The Commission

*speculates* that Couch's existing investors would have demanded rescission had they known that fundraising would be terminated, but the sheer absence of claims of rescission defeat that speculation.

Failing is not illegal. The Commission states that $7.5 million "was needed for a successful program." In reality, $7.5 million was no guarantee of success, just as the full raise for the 59-well program was no guarantee of its success. The Commission offers no summary judgment evidence to support its contention that Couch misrepresented to prospective investors the source of future capital. The Commission miscites the Court to Appendix page 574 [Couch III-87] in support of its contention that Couch lied to investors about the source of future capital. But the transcript does not support the Commission's contention, and instead demonstrates that Couch told XO Marketing that he was going to raise funds from "just institutional." The failure of the program was not attributable to a lack of cash, but to unproductive wells, however, as Couch worked to make the program a success even without hope of compensation due to Couch's cessation of fundraising.

## IV.    CONCLUSION

The Commission has not carried its burden of proof and failed to demonstrate the absence of genuine issues of material fact for the trier of fact, and its Motion for Summary Judgment should be denied.

WHEREFORE PREMISES CONSIDERED, Defendants pray that the Court deny the Commission's Motion for Summary Judgment, and request such other and further relief to which they may show themselves entitled.

Respectfully submitted,

**SCHEEF & STONE, LLP**


By:     */s/ J. Mitchell Little*
        J. Mitchell Little
        Texas State Bar No. 24043788
        2601 Network Blvd., Ste. 102
        Frisco, Texas 75034
        (214) 472-2100  – Telephone
        (214) 472-2150  – Facsimile
        mitch.little@SolidCounsel.com

        **ATTORNEYS FOR DEFENDANTS**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on September 14, 2014, I electronically filed the foregoing document with the clerk of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record:

Janie L. Frank
Timothy Evans
SECURITIES AND EXCHANGE
COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102

*Counsel for Plaintiff*

<u>*/s/ J. Mitchell Little*</u>
J. Mitchell Little