# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CASE NO.  3:14-CV-01747-D |
| CHARLES COUCH and COUCH OIL & GAS, INC. | § § § | |
| Defendants. | § § | |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Dated:  October 5, 2015.

Respectfully submitted,

*/s/ Janie L. Frank*
Janie L. Frank
Texas Bar No. 07363050
Timothy Evans
Texas Bar No. 24065211

SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6478 (JLF)
(817) 978-4927 (facsimile)
*frankj@sec.gov*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

I.      INTRODUCTION ............................................................................1

II.     ARGUMENTS AND AUTHORITIES...........................................................1

      A.     The interests Defendants offered and sold were "securities"
            because they were "working interests" in minerals, and they
            did not qualify as "joint ventures." .....................................................1

            1.     It is undisputed that Defendants sold fractional interests
                  in oil and gas working interests, which are, by statutory
                  definition, "securities." ............................................................1

            2.     Defendants do not raise a genuine issue of material
                  fact that the interests they offered and sold failed
                  the *Howey* test for investment contracts. ...................................3

            3.     The evidence establishes that these interests were not
                  joint venture interests and therefore do not fall within
                  that exclusion from the definition of securities........................4

      B.     Defendants failed to carry their burden that they were entitled
            to a registration exemption....................................................9

      C.     No genuine issues of material fact exist that Defendants
            misrepresented and omitted material facts about the offerings .........................15

            1.     First misrepresentation: Defendants failed to provide
                  title to working interest ..........................................................15

             2.     Second misrepresentation: use of funds.................................17

             3.     Third misrepresentation: production estimates.......................19

             4.     Fourth misrepresentation: radial jet drilling ...........................21

             5.     Fifth misrepresentation: shutting down the program .............................24

III.    CONCLUSION...............................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adena Exploration, Inc. v. Sylvan*,
    860 F.2d 1242 (5th Cir. 1988) ........................................................................2

*Ass'n of Taxicab Operators, USA v. Yellow Checker Cab Co. of Dallas/Fort Worth, Inc.*,
    910 F. Supp. 2d 971 (N.D. Tex. 2012) ............................................................10

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ..............................9, 10

*ConocoPhillips Co. v. Dahlberg*,
    2011 WL 710604 (S.D. Tex. Feb. 22, 2011) ...................................................16

*Doran v. Petroleum Mgmt. Corp.*,
    545 F.2d 893 (5th Cir. 1977) ......................................................................11, 12

*Gordon v. Terry*,
    684 F.2d 736 (11th Cir. 1982) .........................................................................8

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) ...........................................................................9

*Koch v. Hankins*,
    928 F.2d 1471 (9th Cir. 1991) .........................................................................8

*Latimer v. SmithKline & French Lab.*,
    919 F.2d 301 (5th Cir. 1990) ...........................................................................9

*Nor-Tex Agencies, Inc. v. Jones*,
    482 F.2d 1093 (5th Cir. 1973) .........................................................................2

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    ___U.S. ___, 135 S. Ct. 1318 (2015) ..............................................................21

*Preston Exploration Co., L.P. v. GSF, L.L.C.*,
    669 F.3d 518 (5th Cir. 2012) .........................................................................16

*Rubenstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ......................................................................19, 21

*SEC v. Alliance Leasing Corp.*,
   28 Fed. Appx. 648 (9th Cir. 2002)....................................................................18

*SEC v. Continental Tobacco Co.*,
   463 F.2d 137 (5th Cir. 1972) ...................................................................10, 11

*SEC v. Merchant Capital*,
   483 F.3d 747 (11th Cir. 2007) .................................................................7, 21

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1953)...........................................................................................13

*SEC v. Reynolds*,
   2013 WL 3778830 (N.D. Tex. July 19, 2013) ...................................................10

*SEC v. Schooler*,
   2014 WL 1660651 (S.D. Cal. April 25, 2014)....................................................6

*SEC v. Shields*,
   744 F.3d 633 (10th Cir. 2014) ........................................................................6, 7

*SEC v. Spence & Green Chemical Co.*,
   612 F.2d 896 (5th Cir. 1980) ............................................................................10

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)...................................................................................3, 4, 5

*Saltzberg v. TM Sterling/Austin Assocs.*,
   45 F.3d 399 (11th Cir. 1995) .............................................................................20

*Swenson v. Englestad*,
   626 F.2d 421 (5th Cir. 1980) .........................................................................9, 10

*United States v. Donovan*,
   55 Fed. Appx 648 (9th Cir. 2002).....................................................................18

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ...........................................................4, 5, 6, 7, 8

*Youmans v. Simon*,
   791 F.2d 341 (5th Cir. 1986) ..............................................................................5

## FEDERAL STATUTES

Fed. R. Civ. P. 56 ...........................................................................................................1

15 U.S.C. § 77aa ...........................................................................................................14

15 U.S.C. § 77b(1) ..........................................................................................................2

15 U.S.C. § 77g(a)(1) .....................................................................................................13

17 C.F.R. § 230.502(b)(2) ..............................................................................................14

17 C.F.R. § 230.506(b)(1) ..............................................................................................14

17 C.F.R. §§ 230.506(b)(2)(i) .........................................................................................14

Pursuant to Fed. R. Civ. P. 56, Plaintiff Securities and Exchange Commission ("Plaintiff" or "the Commission") files this Reply Brief in Support of Plaintiff's Motion for Summary Judgment, and respectfully shows as follows:

## I.
## INTRODUCTION

The Commission's evidence establishes that the Defendants offered and sold securities, that those securities were unregistered in violation of Section 5 of the Securities Act of 1933 ("Securities Act"), and that, in offering and selling those securities, the Defendants misrepresented or omitted at least five material facts.  Notably, while they argue in their brief that facts are contested, Respondents offer no evidence contradicting the Commission's evidence.  And, as discussed below, their legal arguments are without merit.  As a result, the Commission is entitled to summary judgment on all of its claims.

## II.
## ARGUMENTS AND AUTHORITIES

A.   **The interests Defendants offered and sold were "securities" because they were "working interests" in minerals, and they did not qualify as "joint ventures."**

1.   **It is undisputed that Defendants sold fractional interests in oil and gas working interests, which are, by statutory definition, "securities."**

It is undisputed – indeed Couch himself admits – that the investments at issue were fractional interests in the working interests in the drilling program wells. As Couch testified, the investors purchased a working interest in the wells, not a partnership interest. (App. 545-547 [Couch-I, 65:5-67:19]).  And, the brochures and subscription agreements the Defendants gave investors informed them they were purchasing fractions of the working interests in the program wells and that the investment units purchased would have an equal working interest in all of the program wells.  (App. 001, 070, 073, 076, 077, 160).  These types of investments fall squarely

1

within the definition of securities under the federal securities.  *See* Securities Act, § 2(1) [15 U.S.C. § 77b(1)]; *Adena Exploration, Inc. v. Sylvan*, 860 F.2d 1242, 1249 (5th Cir. 1988); *Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093, 1098 (5th Cir. 1973).  Finally, investors believed they were investing in working interests in the wells at issue.  (App. 148, 190, 193, 207, 223).

Defendants do not dispute this evidence.  They offer no countervailing evidence, beyond references to statements in private placement memoranda ("PPMs") that refer to title being held in the name of a joint venture[1] —a joint venture which Couch admits was never created (App. 582-583 [Couch-III, 152:12-154:2]) and a joint venture agreement that Couch admits he never gave to investors (App. 583-584 [Couch-III, 155:16-158:11]).  With regard to Couch's own admission that these were working interests, Defendants' ask the Court to ignore that and look to the "substance of the situation."  (Response, at 5).[2]  These legal arguments, even if they were

---

[1]        After the Commission stated that it had been unable to find any evidence that Defendants had delivered PPMs to investors (Plaintiff's Brief in Support of Motion for Summary Judgment [Doc. 27] ("Plaintiff's Brief"), at 8), and cited evidence of the PPMs' non-delivery, Defendants failed to rebut that fact with any evidence.  Thus, it appears Defendants' position is that they did not provide the investors with a PPM. And yet, without acknowledging the absence of that evidence, Defendants rely on the PPMs to support their positions that (1) the interests Defendants sold were joint venture interests (because the PPMs described them as such) and (2) that Defendants were not required to transfer title to the working interests to the investors because the PPM stated that title was to be held by the joint venture.  (Response, at 3).  Defendants also mistakenly argue that the Commission's case was built on the PPMs, when clearly it was not.  (*See* Complaint [Doc. 1], at ¶19-24, 29, 32-24, 39, 44).  Couch had testified in the underlying investigation that he provided the PPMs to investors.  Assuming he testified truthfully, the Commission believed that perhaps later discovery would uncover evidence of such delivery and included in its Complaint misrepresentations that were contained in the PPMs as *part* of its case, while acknowledging that it knew of no investor who had received a PPM. (Complaint, at ¶ 20). To date, the Commission is not aware of any evidence that Defendants provided the PPMs to any actual investor or even discussed the PPMs with such persons.  And, it appears that Defendants now concede that the PPMs were not provided to investors.  Accordingly, their attempt to rely on the PPMs to argue that the working interests were not securities is illogical and should be rejected.  In any event, for all the reasons discussed in the Commission's opening brief, even if the PPMs are considered, the interests at issue were not joint ventures.

        Finally, Defendants also seem to argue that the investors' ownership of the working interests in the wells is consistent only with the investment being a joint venture.  (Response, at 3).  But that is not true.  Title to fractional working interests in the wells can be owned outright in a manner consistent with limited partnership interests.  In fact, Defendants' own subscription agreements stated, "Participants will be recognized to participate as limited liability partners …."  (App. 001, 077).

[2]        Given Couch's 40-plus years in the oil industry, it would be unreasonable to conclude that Couch did not understand what he was saying when he admitted the investors purchased working interests in the oil wells in his programs.  Indeed, even after the Commission filed this case, in a May 19, 2014 news article in *The Texas Lawbook* Couch publicly referred to his investors as "working interest owners" and "passive investors."  (Declaration of

supported by evidence, which they are not, are insufficient to preclude summary judgment that the interests at issue were securities. In short, the "substance" of the situation confirms that Defendants sold working interests, which are securities for purposes of the federal securities laws.

>    **2.      Defendants do not raise a genuine issue of material fact that the interests they offered and sold failed the *Howey* test for investment contracts.**

In addition to being fractional interests in minerals, thereby meeting the statutory definition of securities, the interests Defendants sold were also "investment contracts." Investment contracts are securities under the federal securities laws if they meet the three elements established by the Supreme Court: that (1) individuals were led to invest money; (2) in a common enterprise; and (3) with the expectation that they will earn a profit solely through the efforts of the promoter or someone other than themselves. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-299 (1946). Defendants are silent as to the first two elements and, through that silence, admit those elements are met here. Defendants argue only that the Commission failed to offer any evidence proving the third element of the *Howey* test—that "investors were led to expect profits derived from the efforts of others." (Response, at 5).

Defendants are incorrect: the Commission offered extensive evidence of that element, and Defendants failed to respond to it. For example, five investors testified that they *did* expect to be passive investors and that they looked to COG to manage and operate the drilling program and to generate returns on their investment without them having to do anything. (App. 148-149, 190, 193, 207, 224). The investors also testified that they had no experience in oil and gas investments, which was why they looked to COG to perform the work to generate the returns.

---

Jessica Magee [Doc. 13-1], filed in support of Plaintiff's Response in Opposition to Defendants' 12(b)(6) and 12(b)(1) Motion to Dismiss [Doc. 13], at  p. 3 of 10).

(App. 149, 190, 193, 224).  Finally, Couch himself admitted that the investors were "passive."

(App. 547 [Couch-I, 65:6-19]).

Moreover, Defendants' brochures repeatedly emphasized to investors that they were to

rely on Defendants' expertise and work.  The brochures confirmed, for example, that:

- **"Couch Oil will drill and manage all Texas wells with in house staff and equipment.**  This practice allows low initial industry drilling costs and long term inexpensive maintenance. All projects are offered at turn key pricing due to low operating costs and highly trained, experienced crews."  (App. 153 [59 Well Program]) (emphasis in original).

-  "All vertical and horizontal wells are drilled and completed with Couch Oil drilling rigs, work over rigs, coil tubing rigs, and completion units.  (App. 073 [R9 Well Program]).

- "We have found that partnering with large **publicly traded companies on various oil ventures leads to lower returns** … however, having very little control of the development quality of these large projects, uncontrolled drilling costs and large operation expenses caused diminutive returns. By maintaining ownership of our wells, rigs and work over equipment, we now have complete control over all of our projects. This allows us to keep costs to a minimum and generate returns consistant [sic] with the oil and gas industry." (App. 064 [R9 Well Program]) (emphasis in original).

These statements would clearly lead a reasonable investor to expect to earn profits through the

efforts of "others," namely, Defendants.[3]  Defendants' argument that the Commission offered no

evidence to prove the third prong of the *Howey* test is simply incorrect.

> **3.** **The evidence establishes that these interests were not joint venture interests and therefore do not fall within that exclusion from the definition of securities.**

Defendants claim their interests were joint ventures and therefore not securities.  But

under *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981), even joint ventures can be found—in

---

[3]       Moreover, neither brochure contained a single statement regarding what efforts the investors would be obliged, or even able, to undertake to ensure the success of the venture, other than putting up the capital.  (*See generally* App. 059-074, 151-162).

4

substance—to be securities, as the Fifth Circuit described three separate, but non-exclusive, factors which preclude an investment from being a joint venture. *Id.*, at 424. As a threshold matter, it is notable that, unlike most cases involving this issue, Defendants cannot point to an agreement that even gives the nominal appearance of a joint venture. Indeed, it is undisputed that, as Couch admitted, Defendants did not provide investors with a joint venture agreement. (App. 583-584 [Couch-III, 155:16-158:11]). Likewise, there is no evidence that a joint venture agreement even existed. (App. 483, 493-494, 509-510). Instead, Defendants rely mainly on the IRS Form K-1, which COG prepared and provided to investors. Defendants contended that the form "demonstrate[s] the existence of a complete general partnership," presumably because the Form K-1 identifies the investors as "general partners." (Response, at 3-4).[4] But characterization of an interest on a tax form is not one of the criteria under *Howey* or *Williamson* for determining whether an investment is or is not a "security." *See generally Howey*, 328 U.S. at 298-299; *Williamson*, 645 F. 2d at 424. Moreover, regardless of what the Form K-1 stated, the subscription agreements stated that the investors would be treated as "limited liability partners" for tax purposes. (App. 001, 077).[5] These facts alone demonstrate that the investments at issue could not be considered joint venture interests because, if there is no joint venture, it is not necessary to even address the *Williamson* factors.

In any event, Defendants have offered little, if any, evidence rebutting the Commission's evidence on the *Williamson* factors.

---

[4]    General partnership interests are usually not considered to be "securities" because general partners are entrepreneurs, not investors, and have the ability to take care of their own interests because of the inherent powers available to them. *Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir. 1986). But limited partnership interests generally *are* considered to be security interests because the limited partners do not share the kind of authority wielded by general partners. *Id.* "A limited partner's position is analogous to that of a stockholder in a corporation." *Id.*

[5]    Defendants also point to the subscription agreements, which contain references to an "Industry Joint Venture." But references to an "Industry Joint Venture" bear little, if any, relevance to the relevant inquiry. Indeed, even if there was in fact a joint venture agreement, that means little under *Williamson*.

For example, even if the interest is nominally a joint venture, the first *Williamson* factor looks to whether the investment leaves so little power in the hands of investors that the arrangement distributes power the same as a limited partnership.  The Commission provided extensive evidence establishing that was the case here.  In response, Defendants argue only that no investor "even tried to exercise any such powers, much less that any investor actually tried and failed." (Response, at 5-6).  This argument ignores the relevant undisputed facts:

- There was no joint venture agreement.  How would an investor attempt to exercise powers the investor did not even know about when he was never provided with a joint venture agreement spelling out those powers?

- It is undisputed that investors did not know the identity of the other investors (App. 149, 193-194, 208, 223).

- Defendants submitted no evidence that they had a relationship with investors prior to investing.

- It is undisputed that investors did not have access to information that would have enabled them to exercise any authority or powers over the drilling programs.

- Couch admitted the investors were "passive," a key admission the Defendants wholly ignore.

Under these facts, it is beyond reasonable dispute that the investors lacked meaningful control and, as a result, the first *Williamson* factor is satisfied.  *See generally SEC v. Shields*, 744 F.3d 633, 647 (10th Cir. 2014); *SEC v. Schooler*, 2014 WL 1660651, at *8 (S.D. Cal. April 25, 2014).

The presence of only one *Williamson* factor will preclude an investment contract from being considered a joint venture. *Williamson*, 645 F.2d at 424.  But Defendants' interests meet the second and third factors as well. The second *Williamson* factor is that the purported venturers were so inexperienced and unknowledgeable in business affairs that they were incapable of intelligently exercising partnership or joint venturer powers.  *Williamson*, 654 F.2d at 424.  Notably, it is "not the general business experience of the partners" that the second *Williamson*

factor focuses on, but experience *in the particular business* involved. *Shields*, 744 F.3d at 647

(quoting *SEC v. Merchant Capital*, 483 F.3d 747, 762 (11th Cir. 2007)). This is because,

"[r]egardless of the investors' general business expertise, where they are inexperienced in a

particular business, they are likely to be relying solely on the efforts of the promoters to obtain

their profits." *Id.*  The relevant question is not what the subscription agreements stated on their

face, but what the reality actually was.  Consequently, Defendants' reliance on boilerplate

language in the subscription agreements (*see* App. 004)—by which investors warranted to

Defendants that they were "knowledgeable and experienced in business affairs" is legally

irrelevant. (Response, 6).[6]  Defendants have offered no evidence rebutting the Commission's

evidence that, in fact, the investors were not knowledgeable in the specific field, and that there

were no efforts to ensure that they were.  In short, Defendants' investors, lacking *oil industry*

experience in the management and operation of a drilling program, were solely dependent on the

Defendants for the success of the drilling program.

        Under the third *Williamson* factor, even if a joint venture appears to exist, the investment

will be considered a security if the investors are so dependent on some unique entrepreneurial or

managerial ability of the promoter that they cannot replace the manager of the enterprise or

otherwise exercise meaningful partnership or venture powers.  Defendants' only response to this

factor was to argue that the Commission failed to offer any evidence that Defendants' abilities

were unique.  (Response, at 6). Their argument is incorrect.

        In determining whether investors depend on the unique expertise of the promoter, courts

may consider the representations and promises made by the promoters or others to induce

---

[6]        Defendants also argued that the Commission did not offer any evidence that the investors were not
knowledgeable or sophisticated. (Response, at 6).  But, as it relates to the particular business involved, which is what
matters, the Commission *did* offer such evidence in the investor declarations. (App. 149, 190, 193, 207, 224).
Defendants failed to rebut this evidence.

reliance on their entrepreneurial abilities.  *See Gordon v. Terry*, 684 F.2d 736, 742 (11th Cir.

1982) (finding third *Williamson* factor met where promoter of land syndications represented to

investors that, because of his expertise and experience with central Florida real estate market, he

could realize a substantial profit for investors by buying and reselling undeveloped land); *see

also Koch v. Hankins*, 928 F.2d 1471, 1478 (9th Cir. 1991) (considering representations made to

investors in determining whether a transaction is a security).

Defendants' own promises to investors support the finding of uniqueness under the third

factor. Defendants' brochures touted their use of radial jet drilling as a special characteristic of

their particular drilling program, with the R9 Well Program.  The brochures for both programs

also trumpeted the fact that Defendants would perform all of the work and use their own

equipment, thereby making these programs more cost-effective and efficient than other oil

operators' drilling programs.  (App. 061, 064, 065, 073, 153, 158).

In addition to these representations, COG was "unique" in that it had complete and total

control over the investors' funds.  Also, Defendants deposited investor funds into COG's

corporate bank account, commingling them with the COG's corporate funds and with the

proceeds of Defendants' other drilling programs.  (App. 607 [Couch Depo. 112:7-113:6]).

Replacing COG as the operator would require untangling COG's corporate business expenses

from those of the earlier drilling programs, an impossible task since Couch's accounting records

failed to carefully track those expenses. (App. 472-473; 616-617 [Couch Depo. 147:6-149:16]).

Defendants did not rebut this evidence supporting the third *Williamson* factor.

In sum, "mere fact that an investment takes the form of a general partnership or joint

venture does not inevitably insulate it from the reach of the federal securities laws."  *Williamson,*

645 F.2d at 422.  Here, the Court should rule on summary judgment that the investments

Defendants offered and sold were securities.

**B.      Defendants failed to carry their burden that they were entitled to a registration exemption.**

It is undisputed that the transactions at issue were not registered.  And, other than

claiming that the investments they offered and sold were joint venture interests, not securities,

Defendants did not contest any portion of the Commission's *prima facie* case that they violated

Section 5 of the Securities Act.[7]  And, as demonstrated above, there is no question that

Defendants sold the securities, not joint venture interests.

At this point, after the Commission proved its *prima facie* case, the burden shifted to

Defendants to prove that they sold their unregistered securities pursuant to an exemption.

*Swenson v. Englestad*, 626 F.2d 421, 425 (5th Cir. 1980) ("The so-called private offering

exemption is an affirmative defense which must be raised and proved by the defendant").  As

non-movants, Defendants have the burden of *pleading and proving* the applicability of an

exemption from registration because it is an affirmative defense:

> If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Latimer v. SmithKline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990).  Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.; Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).

---

[7]      Defendants claim that the Commission's Section 5 claim is predicated purely on the behavior of the Brokers (Response, at 7), but that is not true.  The Commission's claim is based on Defendants' conduct—that Couch and COG offered and sold, whether directly or indirectly, unregistered securities using interstate communications or the mails.  Defendants' citation to Greg Tuthill's deposition testimony that Couch never instructed him to sell oil and gas investments, and that he did not sell any, does not negate that Defendants sold the securities.

9

*SEC v. Reynolds*, 2013 WL 3778830, at *2 (N.D. Tex. July 19, 2013); *see also Ass'n of Taxicab Operators, USA v. Yellow Checker Cab Co. of Dallas/Fort Worth, Inc.*, 910 F. Supp. 2d 971, 975 (N.D. Tex. 2012) (summary judgment movant may demonstrate entitlement to summary judgment on an issue on which the nonmovant bears the burden of proof by submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or by arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative defense; the burden to avoid summary judgment then shifts to the non-movant ) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).

Rather than meet their burden of proof, Defendants argue—incorrectly—that the Commission bears the burden. The Commission met its burden on its *prima facie* case, conclusively proving each element, then pointed to the absence of evidence supporting an applicable registration exemption, and even submitted evidence negating essential elements of two registration exemptions on which Defendants might rely. (Plaintiff's Brief, at 23-29, and evidence cited therein). Unquestionably, the burden shifted to the Defendants to prove their entitlement to an exemption. *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 156 (5th Cir. 1972) (once the Commission proves a *prima facie* case for violating Section 5, burden shifts to defendant "to prove that it was entitled to the claimed exemption, i.e., that there was no public offering of the securities and that registration was not otherwise required"); *Swenson v. Englestad*, 626 F.2d at 427 (defendant had burden of proving the private offering defense and failed); *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901-902 (5th Cir. 1980) (Commission met its burden to demonstrate a *prima facie* violation of the registration requirements; burden then shifted to defendant to demonstrate his entitlement to an exemption).

Defendants failed to meet their burden.  The Fifth Circuit has held that the most critical factor for proving the private placement exemption is whether the information a registration statement would have provided was in fact disclosed to the offerees (not just investors), or whether the offerees at least had the type of relationship with the issuer that would have provided them access to such information. *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 903 (5th Cir. 1977). "By a position of access we mean a relationship based on factors such as employment, family, or economic bargaining power that enables the offeree effectively to obtain such information." *Id.*  Defendants submitted no such evidence.

As to the element of access, Defendants cite the subscription agreement, in which investors represented that they purchased the investment based on "direct, personal contact with the issuer."  (Response, at 8; App. 002, 078).  But that statement does not address the issue of *access*:  merely because an investor purchased the investment after "personal contact" does not prove the investor had the economic bargaining power. Defendants also argue that all investors represented (in the subscription agreement) that they were accredited and sophisticated. (Response, at 9).  But such statements in subscription agreements do not justify the private placement exemption.  *Continental Tobacco*, 463 F.2d at 160.  In *Continental*, investors signed subscription agreements that represented that the investor had read and reviewed the prospectus and unaudited financials, had questioned the officers and counsel for the company, and that the investor did not desire any further information or data about the company.  The Fifth Circuit held that such a statement is "not sufficient to constitute the … offering a private one in the absence of proof that the purchasers actually *had access* to the kind of information that a

11

registration statement would have disclosed." *Id.* (emphasis added).  In this case, the investor representation in Defendants' subscription agreements was even less specific.

In addition, Defendants did not rebut the Commission's evidence that investors did not have the type of relationship that would provide access:  five investors testified that they had no pre-existing relationship with Couch, as evidenced by the fact that they discovered COG's investment opportunity on the internet or in an advertisement.[8]  (App. 144, 189, 192, 206).  Four out of five investors had never spoken to Couch before investing.  (App. 148, 190, 194, 222).  Two investors had asked for financial information and were told they could not have it.  (App. 190, 193).  Defendants did not rebut this evidence or otherwise prove the nature of their relationship with investors, or offerees.[9]

Another essential element Defendants were required to prove was that they provided all *offerees*, not just investors, with the same information that would have been required in a registration statement.  *Doran*, 545 F.2d at 904 ("[W]e shall require on remand that the defendants demonstrate that all offerees, whatever their expertise, had available the information a registration statement would have afforded a prospective investor in a public offering"); *Swenson*, 626 F.2d at 427 (evidence did not establish that

---

[8]      Defendants object to investor Larry Hollar's testimony that he learned of the 59 Well Program from an advertisement on the grounds that such testimony is hearsay. (Response, at 9).  Defendants' objection is without merit.  Hollar's testimony was not offered to prove the truth of what the advertisement said.  (*See* App. 144).  His testimony proved only how he learned of the Defendants' investment opportunity—which is not hearsay but his first-hand experience.

[9]      Defendants did not maintain information on the offerees. Consequently, they are unable to prove the nature of their relationship with the offerees, how many offerees there were, or that Defendants provided each and every offeree with the type of information found in a registration statement.  In discovery, the Commission asked Defendants to identify all individuals who received a PPM in each program, whether they invested or not.  (App. 519 [Interrogatory Nos. 4, 5]).  Defendants responded that they lacked the information necessary to answer these interrogatories, which indicates they did not keep track of the offerees.  Absent such records, it is impossible for Defendants to prove their entitlement to this exemption—and this is Defendants' burden, not the Commission's. *Swenson*, 626 F.2d at 427 (defense made no attempt to prove the number of people who were offered the securities; failure to adduce any evidence regarding the number of offerees is "fatal" to a private offering defense); *Doran*, 545 F.2d at 910 (it is defendant's burden to prove the number of offerees for a registration exemption).

the corporate books shown to the offerees "contained all the information that Schedule A of the 1933 Act would have required a registration statement to contain.").

While the Commission pointed out this requirement (Plaintiff's Brief, at 25), Defendants repeatedly stated that *no legal authority* exists to support that statement. (Response, at 9-10).  Defendants even cited *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953), as support for their contention that providing such information is not required. However, the Supreme Court states *explicitly* in *Ralston Purina* that an issuer is required to show that offerees "had access to *the kind of information which registration* would disclose." *Id.*, at 127 (emphasis added).

Again, Defendants did not submit such evidence because it does not exist. Defendants claim that the brochures provided to investors were sufficient.  (*See* Response, at 9 [Defendants claimed the brochure was "like a registration statement"]). This argument ignores well-established guidance as to what information registration statements are intended to convey.  The Securities Act requires registration statements to contain information specified in Schedule A to the Act. 15 U.S.C. § 77g(a)(1). Some of the items Schedule A requires, but which were not included in Defendants' program brochures, include:  (9) a statement of capitalization of the issuer;  (12) the amount of funded debt outstanding; (13) the specific purposes in detail and the approximate amounts to be devoted to such purposes for which the security to be offered is to supply funds (or, the use of funds);  (17) all commissions paid in connection with the sale of the security by a person in which the issuer has an interest or which is controlled or directed by the issuer (such as XO Marketing and the Brokers); (25) a balance sheet as of a date not more than 90 days prior to the date of the filing of the registration statement; and (26)

13

a profit and loss statement of the issuer showing earnings and income, the nature and source thereof, expenses, and fixed charges. 15 U.S.C. § 77aa.  Defendants' business synopsis brochures contained none of the foregoing information, and consequently were nothing "like" a registration statement.

It is unclear whether Defendants intend to rely on the Section 506(b) exemption under Regulation D, but, rather than meet their burden of proof, Defendants nonetheless argue that the Commission failed to prove that Defendants were not entitled to it. (Response, at 10-11).  One required element of this exemption is proof that the issuer did not sell securities to more than 35 unaccredited investors. 17 C.F.R. §§ 230.506(b)(2)(i), 230.501(e).  Defendants do not have the records to prove this, at least with the 59 Well Program.  At least three investors stated on their subscription agreements they were not accredited, while 25 made no representation at all, and Defendants failed to produce subscription agreements for another 20 investors.  (App. 481).  That's at least 48 investors; consequently, Defendants cannot prove that 35 or fewer investors were unaccredited.[10]

In addition, Defendants also fail to prove another essential element required for the 506(b) exemption--that they provided certain financial information.  17 C.F.R. § 230.506(b)(1); 17 C.F.R. § 230.502(b)(2).  Defendants were required to provide a balance sheet, dated within 120 days of the start of the offering or financial statements, prepared in accordance with generally accepted accounting practices by independent public or certified accountants (for offerings between $2 million and $7.5 million), or audited financial statements or balance sheets (for offerings of $7.5 million or greater).

---

[10]      Defendants claim that "the bulk" of their investors were accredited, an irrelevant point.  (Response, at 10).

Defendants did not have audited financial statements (App. 622 [Couch Depo. 202:20-203:6]), and they did not provide balance sheets or financial statements. (*See* App. 190, 193, 223-224).[11] Thus, Defendants were ineligible for the 506(b) exemption.

Because Defendants failed to meet their burden, no exemption applies, and the Commission is entitled to summary judgment on its Section 5 claim.

**C.      No genuine issues of material fact exist that Defendants misrepresented and omitted material facts about the offerings.**

As demonstrated in the Commission's motion, brief, and appendix, Defendants violated the antifraud provisions of both Securities Act and the Exchange Act of 1934 ("Exchange Act"). The Commission needs to show the absence of a genuine issue of material fact *on only one* of the five misrepresentations and omissions to be entitled to summary judgment on its fraud claims. The Commission met its burden on all five. Defendants have not rebutted the Commission's evidence or arguments.

**1.   First misrepresentation: Defendants failed to provide title to working interest.**

The Commission established that Defendants falsely represented that they would transfer title to the working interests to the investors. Defendants admit they have not conveyed title to investors. (Response, at 11). They instead argue that they never represented that they would transfer title to the working interests to investors. In fact, they argue that the PPMs stated that title would be held in the name of the joint venture (Response, at 3)—even though there is

---

[11]        Defendants attempt to create a fact issue by contrasting the subscription agreements with the investor declarations, pointing out that the investors who provided declarations warranted to Defendants that they were sophisticated and experienced businessmen. But the accredited and experienced status is irrelevant to whether they received, and therefore not a genuine issue of material fact. An investor's representation that he was sophisticated and experienced in business affairs, or even accredited, does not excuse Defendants' failure to provide the required financial information.

15

no evidence that investors received the PPMs and even though Couch admitted he did not give investors a joint venture agreement. (App. 583-584 [Couch-III, 155:16-158:11]).

Defendants' argument ignores the reality of their offered investment.  Defendants offered and sold an intangible interest in real property: working interests in oil wells.  The sale of such an interest cannot be valid or complete unless the investors receive title, and, because the interests are intangible, they must be represented by something, such as a document of title, which is commonly expressed in an assignment of interest.  Indeed, because a working interest in oil and gas is a real property interest, it is subject to the Statute of Frauds, which requires contracts related to real property to be in writing to be enforceable.  *Preston Exploration Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012); *ConocoPhillips Co. v. Dahlberg*, 2011 WL 710604, at * 5 (S.D. Tex. Feb. 22, 2011).  In short, in order to make good on their offer to convey a working interest, Defendants had to convey title, in writing, to the investors.[12]  Because this is such a fundamental concept inherent in the transaction, Defendants did not have to affirmatively represent they would transfer title to the wells' working interest. In fact, the failure to disclose that title would *not* be conveyed was a material omission.  The Defendants' conduct in this regard also constitutes a scheme to defraud under Section 17(a)(3) of the Securities Act and Rule 10b-5(c) pursuant to the Exchange Act, to the extent Defendants were selling interests in real property and then withholding the transfer of legal title.[13]

---

[12]     The subscription agreements cannot serve as documents of legally enforceable title under the Statute of Frauds because they fail to identify the wells or their location with reasonable specificity.  *Preston Exploration,* 669 F.3d at 522.  Were they to be recorded in county deed records, the subscription agreements in both programs do not contain any information that provides notice, with any reasonable certainty, as to the identity of the real property interest being conveyed.

[13]     Defendants also argue, without any supporting evidence, that Couch's prior "partnership" functioned by retaining title to the working interest in the partnership's name for the convenience of having joint interest billings and revenue distribution handled by one industry partner.  Defendants' past practices are not relevant.  Defendants represented that they were selling working interests, not an interest in a partnership that would retain title to the wells on their behalf. Based on Defendants' affirmative representations that investors were purchasing working

**2.   Second misrepresentation: use of funds.**

The second set of Defendants' misrepresentations related to Defendants' use of funds.

Defendants admit that they did not disclose the 30% commissions to the Brokers. (Response, at

12).  Rather than contest the Commission's evidence of those facts, Defendants argue several

points not supported by any summary judgment evidence, including:

- "Couch basically bankrupted himself trying to make the programs work, adding additional wells and performing additional work." (Response, at 12).

- "Couch ended up spending every dollar he received from the offering and then some in an effort to help the programs reach profitability." (Response, at 13).[14]

- Because the Defendants themselves were performing the actual work involved in each offering, however, the payments to XO Marketing affected neither the financial condition, solvency, or profitability of either the R9 or 59-Well Programs." (*Id.*).

Because these statements are unsupported, they must be disregarded.  But even if they were true,

Defendants have not explained – nor could they – how those facts would change the fact that

they misled investors about how the investors' money would be spent.

In fact, Defendants admit that the offering documents did not disclose the payments to

XO Marketing (the 30% commission to the Brokers), but claim that this omission does not make

"some other statement" in the brochures misleading, and therefore that omission is not

actionable.  This argument is wrong.  Defendants stated in their brochures that $10 million would

---

interests in oil wells, investors rightly expected to be the owners of fractional interests in the working interests in the program wells, which they cannot be without title.  Now, without title to what they believed they purchased, investors own nothing except a contract right against COG—not what they bargained for.

[14]      Actually, the Declaration of Ty Martinez, submitted by the Commission, confirms that Couch spent all the money raised—just not on the particular drilling program for which it was raised.  (App. 473-475).  Indeed, given the state of Defendants' financial books, Defendants would never be able to prove that they spent all the money raised on the drilling program for which it was raised.  In addition, Couch identified expenses from the 2010-2012 time period *unrelated* to the R9 and 59 Well Programs that were paid for with investors' funds from those programs. (App. 473-475; 609-611 [Couch Depo. 119:18-127:8]; 612-615 [Couch Depo. 130:7-142:14]).

17

be needed to drill all the wells in each program; thus, their brochures led investors to believe that 100% of the money raised would go towards the drilling of the wells.

A reasonable investor would want to know, in advance, if 30% of their investment was being spent on transactional costs, or commissions, rather than being put to work on the drilling program.  This was confirmed by actual investors, who testified to that fact. (App. 149, 191, 194, 224).  These investors said they believed a 30% commission was too high and they would not have invested had they known such a high commission was being paid.  Legally, failure to disclose a 30% sales commission is a material omission as a matter of law.  *SEC v. Alliance Leasing Corp.*, 28 Fed. Appx. 648, 652 (9th Cir. 2002) (30% commissions were "so obviously important to an investor, that reasonable minds cannot different on the question of materiality"); *see also United States v. Donovan*, 55 Fed. Appx. 16, 21 (2d Cir. 2003) (omitted fact is material if it is substantially likely that a reasonable investor would consider it important in making an investment decision; investors testified at trial that they would not have invested if they had known about the 30% commissions).

Defendants argued that, in this case, even if 100% of the money had been invested in the wells, the programs would still have failed because of the "inability to extract it [the oil] from the ground."  In other words, no amount of money would have saved these drilling programs—an interesting position given the extraordinarily positive and definitive statements Defendants made in their brochures projecting production (see next section).  And while that may be true, the point is not whether spending 100% of the funds would have guaranteed the ultimate results of the program; the point is Defendants failed to disclose material information *ab initio*, information that investors would want to know, and were entitled to know, so they could make an informed choice as to whether to invest.

18

### 3.   Third misrepresentation: production estimates.

The third set of misrepresentations on which the Commission's motion for summary judgment is based concern the unrealistic production projections in Defendants' brochures. Defendants do not address the Commission's evidence and instead rely heavily on the argument that their projections were non-actionable, forward-looking statements.  They claim that the "bespeaks caution" doctrine "bars" liability because Defendants included two vague risk disclosures in their subscription agreements.

As Defendants correctly acknowledge, a predictive statement *can* form the basis of a fraud claim if the speaker does not in fact believe the statement, if no reasonable basis exists for the speaker's belief, or if the speaker is aware of any undisclosed facts that would tend to seriously undermine the accuracy of the predictive statement. (Response, at 16).  *Rubenstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994).  In its brief, the Commission pointed out the following:

- Defendants predicted that the program wells would produce, as a group, 270 to 1580 barrels of oil per day ("bopd") (for the 59 Well Program) (App. 151) and 282 to 672 bopd (for the R9 Well Program) (App. 062).  Unrebutted summary judgment evidence showed that Couch, as an experienced oil and gas operator, had no reasonable basis for such predictions because he arrived at these projections by "picking the **best** comparable wells" and adopting their production. (App. 587 [Couch-III, 189:8-19]; 311-312) (emphasis added).

- Defendants' projection of revenues for all the wells was unreasonable because it failed to consider the steep decline in production that inevitably occurs after initial production. (App. 311).[15]  Defendants' projected payouts in their brochures, based on constant initial production, therefore had no basis in fact. (App. 065, 153).

---

[15]      In the partially depleted reservoir in which Defendants were drilling, production from oil wells decline rapidly after the initial production, as the unrebutted testimony from Dr. Strickland demonstrated.  (App. 311-312). Couch, with his 40-plus years of experience in the oil industry, knew, or was reckless in not knowing, that.  Couch admitted that he knew initial production is the high point and that production declines after that.  (*See* App. 586 [Couch-III, 185:2-15]).

- Defendants predicted that the program wells would "most likely" produce an average of 150,000 to 250,000 barrels over their life. (App. 064, 153). As demonstrated by Dr. Strickland's research, that projection was "optimistic to the point of absurdity." (App. 310, 312-313).

- Defendants predicted that the five new vertical wells in the 59 Well Program would produce a minimum of 20 bopd each, and produce that constantly over time. (App. 151). In fact, Defendants knew by January 2011 that at least three of these five wells failed to achieve the 20 bopd minimum on their initial production tests, and that production would decline from that high point. (App. 298, 438-466; 311-312). But Defendants continued to sell the 59 Well Program without correcting the original production estimates. (App. 148 [Hollar purchased his interest March 25, 2011]; 193 [Shover purchased April 7, 2011]; Couch App. 9 [Schwartz purchased March 7, 2011]).

- Also in the 59 Well Program, Defendants predicted that their second horizontal well would produce 100 to 700 bopd. Couch had absolutely no factual basis for that prediction; Dr. Strickland explained that the well on which Couch said he based his projection had not even been drilled until after Defendants stopped selling the 59 Well Program. (App. 324-326).

- In the R9 Well Program brochure, Defendants unreasonably represented that, with radial jet drilling, their horizontal wells would drain up to 70% of the original oil in place ("OOIP"), vastly exceeding the typical 15%. (App. 068). That statement had no basis in fact, as horizontal wells do not recover more OOIP than a vertical well. (App. 315-316).

Defendants do not discuss or address these undisputable facts that are flatly inconsistent with Defendants' false promises to investors. Consequently, they may, and should be, held accountable for those false assurances.

In addition, Defendants' putative "disclaimers" are insufficient to protect them. The "bespeaks caution" doctrine provides that, "When an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language *may be* sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." *Saltzberg v. TM Sterling/Austin Associates*, 45 F.3d 399, 399 (11th Cir. 1995) (emphasis added). Cautionary statements and specific warnings of risks involved will

20

render such misrepresentations immaterial *only if* the cautionary language is meaningful. *SEC v. Merchant Capital*, 483 F.3d at 767.

Defendants point to a risk disclosure in the R9 Well Program subscription agreement, in capital letters, that stated that the investment is speculative and should only be invested in by people who can afford to sustain a total loss. (App. 075). Such a statement falls into the category of "not meaningful." It is not specific about anything, including the predictive statements of actual production. It does not caution investors about any specific risk.

The other risk disclosure Defendants rely on does specifically relate to the projections, but the projections on which the Commission bases its case have been proven, through expert testimony and facts, to not have a reasonable basis, or to have been false when made, such as the projections of production in the 59 Well Program after January 2011. *Rubenstein*, 20 F.3d at 170. Consequently, the "bespeaks caution" doctrine does not apply to excuse Defendants' misleading predictive statements.[16]

### 4. Fourth misrepresentation: radial jet drilling.

As elsewhere in their Response, Defendants make a number of statements for which they provide no summary judgment evidence, such as the following:

- "Couch was drawing on the majority of the experts in the field of radial jet drilling to apply the technology to the R9 program in an effort to make it as successful as possible." (Response, at 20).

- Couch's statements in the brochure "were not intended to be representative of Couch's past radial jet experience." (Response, at 20-21).

---

[16]     Defendants also rely on *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, ___U.S. ___, 135 S. Ct. 1318 (2015), quoting heavily from it. That case is inapplicable here, as it dealt with expressions of opinion. The case focused on statements that begin with "we believe" or "I think." As none of the statements in Defendants' brochures begin with "we believe" or "we think", that part of *Omnicare*'s analysis is not relevant. However, even in *Omnicare*, the Supreme Court stated that an expression of opinion can still result in liability if the speaker omitted a relevant fact about which he had special knowledge. *Id.*, at 1330-1331.

- "Couch took a successful, mainstream technology and applied it to the subject wells in this case in an effort to improve production."  (Response, at 21).

- "In point of fact, Couch had every reason to believe that he could and would successfully deploy radial jet drilling technology on the R9 and 59-Well programs." (*Id.*).

Respondents have cited to no factual support in the record for any of these statements; they must therefore be disregarded.  After eliminating these unsupported statements, Defendants' remaining argument is that their statements were "forward-looking" and therefore neutralized by the risk disclosures in the subscription agreement.  But Defendants' brochures contained no risk disclosures about radial jet drilling that would bespeak caution to the investors.  Thus, that doctrine does not help Defendants evade liability on the radial jet drilling misrepresentation.

Moreover, the statements are not actually "forward-looking."  The cumulative effect of the brochure's four pages of radial jet discussion is a clear impression that this is technology Defendants used regularly and successfully and that these are statements of past experience, not predictions of what might happen in the future.  Thus, because the language conveys information as if it were past experience, they are not actually forward-looking predictions.

Respondents also argue that the Commission does not prove fraud because Dr. Strickland's report did not offer "any facts of which Couch was aware with regard to radial jet drilling that he had failed to disclose in communications and that render other statements he made misleading."  (Response, at 20).  It was not facts about radial jet drilling, however, that made Defendants' brochures misleading; it was the omission that Couch was having difficulties getting the process to work.  Dr. Strickland's opinion is based on Couch's own descriptions of his own problems with radial jet drilling.  Dr. Strickland collected examples of Couch's own statements in Appendix N to his expert report (App. 404-409), from Couch's investigative

testimony and emailed updates sent to investors.  In these statements, Couch admitted, after

disseminating the brochure to investors, that he was still trying to figure out the radial jet

technology.  For example, on February 9, 2012, Couch testified:

> Q      When do you plan to do this for the Guy Ranch wells?
> A      *Once I, I get the bugs worked out of it.*
> …
> A      But Dr. Chowdhury has been pushing me to go do radials in the No. 1 well, but
>        *I'm afraid to touch it until I get the technology perfected.*

(App. 405) (emphasis added).  These statements are admissions that Couch was not getting the

technology to work as he represented it would to investors.

But in their Response, Defendants now actually admit that, while "it is clear that Couch

was proving up the technology in the Andrews Field," Couch never represented that the

technology was perfect or completely predictable.  (Response, at 20).  The Commission never

alleged that couch represented it was perfect or predictable.  It is the fact that Couch was

"proving up the technology" that is the heart of the Commission's claim:  it was misleading for

Defendants to omit telling investors that they were still "proving up the technology."

In addition to that omission, Defendants made explicit misrepresentations about drilling a

300-foot laterals that were not based on facts.  Defendants' Response entirely fails to address

these points.  The brochure discussed several features of the 300-foot laterals in such a way as to

imply that Defendants had already drilled such laterals and that the results discussed in these

paragraphs were a certainty to happen:

- "However, each Radial Jet Enhancement extends up to 300 feet from the well bore, thus increasing the area of production several fold."

- "Each lateral of 300 feet will pull from over 360,000 cubic feet [of pay zone]."

- "Four – 300' laterals will drain up to 70% of the OOIP because the radials are closer to the well bore and allow better oil migration."

- "One well with 4 -300' radials costs around $1.0 million to drain 70% of OOIP, which can be completed in 4 to six days."

(App. 068).  All of these statements are deceitful because they leave the impression that they were based on actual experience, when that was not the case.  Couch admitted later he had never drilled a 300-foot lateral and he had no idea how much one would cost.  (App. 550-551 [Couch-I, 86:4-87:11]).  Two of these statements are written in the present tense and therefore are *not* predictions but representations of an existing fact that was not true.  The other two statements use the word "will", leading Defendants to argue *post hoc* that the statements were "predictive." But their context is clearly not that of an uncertain estimate of future events.  A reasonable investor would be left with the belief that these are existing "facts" related to 300-foot laterals. But, based on Couch's own later admissions, that he was still "working out the bugs," those statements were false and misleading because they did not accurately state Couch's experience.

### 5.  Fifth misrepresentation: shutting down the program.

Defendants do not rebut the Commission's allegations that Defendants failed to disclose to the R9 Well Program investors, at least to those who invested before January 23, 2012, that they intended to terminate the program early before raising from private investors the full $7.5 million.  Defendants do not deny that they failed to inform at least some investors who purchased their working interests that they planned to terminate fund-raising early and that Couch (he now claims) intended to borrow the balance of the funds needed for the program. (App. 575 [Couch-III, 98:11-100:5]).  These were material facts that reasonable investors would have wanted to know.  Couch admitted that he never changed the R9 Well Program brochure.

Defendants contend that Couch has been "consistent" in stating that he instructed the Brokers to cease contact with investors shortly after he met with the Commission. (Response, at

24

21).  But *when* Couch told the Brokers to stop contacting investors and raising money is not material; when Couch *made the decision* to terminate the program early is material, and it is undisputed that he did so within days of the October 28, 2012 meeting with Commission staff. Moreover, it is uncontested that, regardless of when he told the Brokers to stop raising funds, he continued to accept investor funds *for another three months after the date he made the decision*, without revealing that he intended to stop the fund-raising before obtaining the full $7.5 million. Even if Couch intended to borrow the funds, or to raise funds from institutional investors, after January 27, 2012, the investors who invested during that time period were entitled to know Couch's intentions before they invested their money.[17]  Defendants did not rebut the fact that they did not disclose to the investors before January 23, 2012, that Couch was fundamentally changing the funding of the R9 Well Program.

As to all five categories of the misrepresentations and omissions, Defendants failed to rebut the facts presented by the Commission.  No genuine issue of any material fact exists on the fraud claims.  Defendants offered only legal arguments as to why the Commission is not entitled to summary judgment, and their arguments are insufficient to overcome the evidence.  Therefore, the Commission is entitled to summary judgment on its antifraud violations.

## III.
## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's motion for summary judgment and grant Plaintiff such other relief as it may be entitled.

---

[17]     Defendants argue that Couch "attempted" to raise the remaining money from institutional investors, but they submitted no summary judgment evidence of any such attempts, its alleged lack of success, or of any alleged efforts to borrow money.  They claim Couch "worked to make the program a success even though there was no hope of compensation due to Couch's cessation of fundraising."  (Response, at 22).  But, again, they submitted no summary judgment evidence to prove those statements.

Dated:  October 5, 2015.                    Respectfully submitted,

                                            /s/ Janie L. Frank

                                            Janie L. Frank
                                            Texas Bar No. 07363050
                                            Timothy Evans
                                            Texas Bar No. 24065211
                                            SECURITIES AND EXCHANGE COMMISSION
                                            Fort Worth Regional Office
                                            Burnett Plaza, Suite 1900
                                            801 Cherry Street, Unit #18
                                            Fort Worth, TX 76102-6882
                                            (817) 978-6478
                                            (817) 978-4927 (facsimile)
                                            frankj@sec.gov

## CERTIFICATE OF SERVICE

        On October 5, 2015, I electronically submitted the foregoing document to the Clerk of the
Court of the U.S. District Court, Northern District of Texas, Dallas Division, using the CM/ECF
system.  The electronic case filing system will send a "Notice of Electronic Filing" to all counsel
of record who has consented in writing to accept service of this document by electronic means.

                                             s/ Janie L. Frank
                                            Janie L. Frank

26